FRIENDSHIP DAIRIES, INC. AND SUBSIDIARIES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 31368-85.        Filed May 23, 1988.

*Robert H. Aland, Gregg D. Lemein, Frederick P. Wick, Jr.,* and *Frederick E. Henry III,* for the petitioner.

*Lawrence C. Letkewicz* and *Joel D. Arnold,* for the respondent.

COHEN, *Judge:* Respondent determined a deficiency of $298,672 in petitioner's income tax for the taxable year ended September 27, 1980. Respondent also determined that such deficiency is subject to an addition to tax pursuant to

section 6621(c).[1]

The issues for decision are as follows:

(1) Whether petitioner's purchase of an IBM. Model 3033N8 computer and related equipment was a transaction having economic substance so that such purchase must be respected for Federal income tax purposes;

(2) Whether petitioner was the owner of the computer equipment for Federal income tax purposes;

(3) Whether petitioner's limited recourse promissory note in the principal amount of $1,962,250 represented genuine indebtedness of petitioner;

(4) Whether petitioner's cost basis in the computer equipment was $2,005,000; and

(5) Whether the increased rate of interest under section 6621(c) applies with regard to interest accruing after December 31, 1984.

## FINDINGS OF FACT

Some of the facts have been stipulated, and the facts set forth in the stipulation are incorporated in our findings by this reference.

### *Petitioner and Its Business*

Friendship Dairies, Inc. (petitioner), the common parent of an affiliated group, is a corporation organized in 1937 and validly existing under the laws of the State of New York. Its principal place of business during all times pertinent hereto was in Maspeth, New York.

In 1980, petitioner manufactured and distributed dairy products. Petitioner was the largest manufacturer of cottage cheese, sour cream, dried milk, yogurt, butter, and buttermilk in the New York City metropolitan area. Petitioner had sales of approximately $40 million, assets of approximately $14.5 million, net worth of about $7.5 million, and about 225 employees.

Martin P. Schanback (Schanback) was petitioner's president, chief executive officer, and principal shareholder. Schanback was an experienced businessman with a college

---

[1]All section references are to the Internal Revenue Code as amended and in effect during the year in issue, except as otherwise noted.

degree in electrical engineering. He had ultimate responsibility for all aspects of petitioner's operations for about 40 years. He was also responsible for the operations of Trecho Transport, a trucking company purchased by petitioner in the mid-1970's; an investor and principal officer in N.J. Martin Enterprises, Inc., a company engaged in buying and selling new and used industrial equipment; and an investor in real estate ventures. His responsibilities for petitioner included review of potential acquisitions of other businesses such as Mendon Leasing Co., a truck leasing company, and Peerless Shoe Co. (Peerless), a shoe manufacturing company.

## O.P.M. Purchases the Equipment

O.P.M. Leasing Services, Inc. (O.P.M.) was a corporation engaged in the buying, selling, and leasing of new and used computer equipment. On June 10, 1980, O.P.M. executed an agreement to purchase new IBM computer equipment (the equipment) consisting of the following:

| Quantity | Type | Model/Feature | Description | Serial number | Price |
|---|---|---|---|---|---|
| 1 | 3033 | N8 | Central processing unit | 21066 | $2,115,000 |
| 1 | 3036 | 001 | Console | 21857 | 120,000 |
| 1 | 3037 | 001 | Power and coolant distribution unit | 21126 | 130,000 |
| | | | | | 2,365,000 |

On September 18, 1980, IBM accepted O.P.M.'s order. On or before that date, the price of the 3033N8 was reduced by IBM to $1,755,000, so that the total price to O.P.M. was reduced to $2,005,000.

O.P.M. partially financed its purchase of the equipment through a nonrecourse loan from LaSalle National Bank (LaSalle) in the principal amount of $1,441,604.41. O.P.M.'s loan from LaSalle was payable in 48 monthly installments of principal and interest in the amount of $38,496 each.

## O.P.M. Leases the Equipment to Polk

O.P.M. and R.L. Polk & Co., Inc. (Polk), entered into an agreement on September 17, 1980, whereby O.P.M. agreed to lease the equipment to Polk for a period of 48 months at $38,496 per month. O.P.M.'s loan from LaSalle was secured by the equipment and by an assignment of its rights under

the lease with Polk. Polk agreed to pay the monthly rent under its lease with O.P.M. directly to LaSalle.

The transactions between O.P.M., LaSalle, and Polk were valid transactions possessing both economic substance and business purposes. The difference between the amount of O.P.M.'s loan from LaSalle and the amount it was required to pay IBM for the equipment was $563,395.59.

### Petitioner Purchases the Equipment

On September 26, 1980, one day prior to the end of petitioner's taxable year, petitioner, O.P.M., and Starfire Leasing Corp. (Starfire) entered into a series of prearranged and interrelated transactions.

The closing of the transactions took place at the offices of Spengler, Carlson, Gubar & Brodsky, a New York law firm. Documents executed and delivered at the closing included the following:

(a) Purchase agreement under which Starfire purchased the equipment from O.P.M. for $2,100,250.

(b) Purchase agreement under which petitioner purchased the equipment from Starfire for $2,105,250.

(c) Agreement of lease between petitioner and O.P.M. pursuant to which petitioner leased the equipment to O.P.M., subject to the O.P.M.-Polk lease, for the period from September 26, 1980, through September 30, 1989, for monthly rentals of $580.70 for the period prior to September 28, 1980; $4,695.52 for October 1980 through September 1981; $7,570.52 for October 1981 through September 1982; and $38,301.71 for October 1982 through September 1989.

(d) Remarketing agreement between petitioner and O.P.M. under which O.P.M. was appointed as petitioner's exclusive agent to use its "best efforts" to remarket the equipment at the end of the lease from petitioner to O.P.M. in September 1989 for a fee equal to 10 percent of the proceeds received by petitioner due to O.P.M.'s remarketing efforts.

(e) Letter of instructions directing O.P.M. to pay a portion of the monthly rents due to petitioner to Starfire and the balance to petitioner.

Petitioner paid Starfire for the equipment at the closing by delivering the following:

(a) Petitioner's interest-bearing nonnegotiable limited recourse promissory note—security agreement to Starfire in the amount of $1,962,250.

(b) Two certified checks to Starfire in the total amount of $144,000, which consisted of $1,000 in interest on petitioner's $1,962,250 note and $143,000 as a downpayment of purchase price.

(c) Petitioner's interest-bearing promissory note to Starfire in the amount of $240,000 due January 31, 1981, pursuant to paragraph 1.3(b) of the purchase agreement between petitioner and Starfire, in payment of portions of the first 12 installments due under petitioner's $1,962,250 note.

(d) Petitioner's interest-bearing promissory note to Starfire in the amount of $205,500 due on October 31, 1981, pursuant to paragraph 1.3(b) of the purchase agreement, in payment of portions of the second 12 installments due under petitioner's $1,962,250 note.

Starfire paid O.P.M. for the equipment at the closing by delivering the following:

(a) Starfire's full recourse installment promissory note to O.P.M. in the amount of $1,962,250.

(b) Cash of $139,000 consisting of $1,000 in interest on Starfire's $1,962,250 note and $138,000 as a downpayment of the purchase price.

(c) Assignment of petitioner's $240,000 and $205,500 notes in payment of certain obligations under Starfire's full recourse promissory note.

Starfire, on behalf of O.P.M., assigned the short-term notes executed by petitioner to Intercontinental Monetary Corp., an unrelated investment banking firm, which in turn assigned them to Bancomer S.A., a major Mexican bank. The discounting and assignment of petitioner's short-term notes were prearranged by or on behalf of O.P.M. so that it could maximize the amount of cash that it received at closing.

The difference between the payments on petitioner's long-term note to Starfire and the monthly payments on Starfire's long-term note to O.P.M., after subtracting the interest payments during the first 24 months of each of those notes, was $6.54 for the period ending September 28, 1980, $98.11 for each of the 24 months thereafter, and $65.51 for the remaining 84 months. These amounts represent the monthly cash-flow which Starfire expected to realize from this transaction. Apart from Starfire's $5,000 profit on its sale of the equipment to petitioner, Starfire's cash-flow resulted solely from the difference in the interest rates specified in the long-term notes. Petitioner's note to Starfire specified a 14.5-percent interest rate, while Starfire's note to O.P.M. specified a 14.44-percent rate.

The difference between the rent which petitioner was to receive under its lease with O.P.M. and the amount of the monthly payments under its long-term note, after subtracting the interest payments during the first 24 months, was $985 per month for 108 months. Petitioner directed O.P.M. to pay directly to Starfire an amount equal to its monthly note payments and to pay it the remaining balance of $985 per month. This amount represented the monthly cash-flow which petitioner expected to realize from this transaction. Petitioner's total expected cash-flow over the term of the lease was $106,380.

### Petitioner's Expected Return

Petitioner's investment in the equipment consisted of its cash downpayment and the principal and interest payments on the short-term and long-term notes issued to Starfire. Petitioner's expected return from the equipment consisted of rent to be paid by O.P.M. and the residual value of the equipment (reduced by remarketing expenses) at the end of the lease term in 1989. At the time of purchase on September 26, 1980, Schanback, on behalf of petitioner, assumed that the equipment would have a residual value at the end of the lease to O.P.M. of 20 to 25 percent of petitioner's purchase price.

Joel Mallin (Mallin), a New York attorney and equipment broker, arranged petitioner's transaction with O.P.M. Petitioner and its advisers relied to a large extent on Mallin's

opinion of the equipment's residual value. Arranging trans-
actions with O.P.M. accounted for approximately 30 to 40
percent of Mallin's business between 1975 and 1980. Mallin
knew that he would receive a substantial commission if the
transactions among O.P.M., Starfire, and petitioner were
consummated. Mallin provided petitioner with a spread
sheet prepared at his office. The spread sheet described the
tax benefits to petitioner from the transactions, and as-
sumed that the equipment would have a net residual value
of $463,155 after payment of O.P.M.'s 10-percent remarket-
ing fee.

Mallin also provided petitioner and its advisers with a
letter dated February 15, 1980, from Alexander Grant &
Co., discussing the accounting treatment of a typical sale
leaseback transaction involving computer equipment. The
accounting firm's letter was one of the factors that peti-
tioner and its advisers relied upon in determining that 22
percent was a reasonable residual value for the equipment
at the end of 9 years. The letter described a computer
having a life of 7 years and a residual value of 22.5 percent.
The letter did not describe the computer in terms of any
particular manufacturer or model number.

Another factor that petitioner relied upon in determining
that 22 percent was a reasonable residual value was a
similar transaction entered into by Peerless in 1978. Peti-
tioner became aware of this transaction as a result of its
attempts, later abandoned, to acquire Peerless. Mallin was
the promoter of the transaction entered into by Peerless.
Petitioner's advisers in this transaction represented Peerless
in its purchase and lease of computer equipment. Peerless
anticipated that the equipment that was the subject of its
transaction would have a residual value of 22 percent.
Neither petitioner nor its advisers attempted to inform
themselves as to technological developments in the com-
puter industry after the date of the transactions entered
into by Peerless.

Petitioner's total expected investment in the equipment
was as follows:

a. Payment at closing............................... $143,000.00
   (9/26/80)
b. $1,962,250 Limited recourse
   promissory note:
     i. Interest...................   $1,580.70
       (9/27/80)
    ii. Interest...................   569,052.48
       (10/25/80—9/25/82)
       [$23,710.52/mo. × 24]
   iii. Principal and interest ......   3,134,602.80   3,705,235.98
       (10/25/82—9/24/89)
       [$37,316.70/mo. × 84]
c. Interest on recourse promissory notes .............. 40,145.00
d. Total cash investment ........................... 3,888,380.98

Petitioner expected to receive a total cash return from the transaction as follows:

a. Rent from O.P.M.:
     i. Initial (9/28/80) ................................. $580.70
    ii. Months 1 to 12 (10/80—9/81) .................... 56,346.24
       [$4,695.52/mo. × 12]
   iii. Months 12-24 (10/81—9/82) ..................... 90,846.24
       [$7,570.52/mo. × 12]
   iv. Months 25-108 (10/82—9/89)..................... 3,217,343.64
       [$38,301.71/mo. × 84]
b. Highest estimated residual value of equipment (25%)... 526,312.50
c. Less 10% remarketing fee ........................... 52,631.25
d. Total cash return based upon highest estimated
     residual value..................................... 3,838,798.07

Under petitioner's most optimistic assumptions, there was no possibility of economic profit without taking the investment tax credit into account. Petitioner and its advisers thus considered the investment tax credit to be critical to its decision to purchase the equipment. In order to ensure that an investment tax credit would be available on the equipment, one of petitioner's attorneys went to Polk's premises to verify that the equipment had not been placed in service prior to its purchase by petitioner, and this fact was confirmed by a telephone call from the closing of the transaction in New York. The equipment was placed in service after petitioner became the owner on September 26, 1980, in order to ensure that the investment tax credit would be available to petitioner.

The investment tax credit of $210,525 (10 percent of cost) was viewed by petitioner and its advisers as a reduction of petitioner's cost of purchasing the equipment. Thus, petitioner's expected return from the transaction was as follows:

|  |  | Highest |
|---|---|---|
| a. Cash return | | $3,838,798.07 |
| b. Less cash investment: | | |
|     i. Cash outlay | $3,888,380.98 | |
|     ii. Less ITC | 210,525.00 | 3,677,855.98 |
| c. Expected net return | | 160,942.10 |

## OPINION

We must once again grapple with the intricacies of a computer purchase and lease transaction. In previous decisions we have relied on the principles expressed in *Frank Lyon Co. v. United States,* 435 U.S. 561 (1978), to determine whether similar transactions would be respected for Federal income tax purposes. See, e.g., *Larsen v. Commissioner,* 89 T.C. 1229 (1987); *Torres v. Commissioner,* 88 T.C. 702 (1987); *Bussing v. Commissioner,* 88 T.C. 449 (1987), rehearing denied 89 T.C. 1050 (1987); *Gefen v. Commissioner,* 87 T.C. 1471 (1986); *Mukerji v. Commissioner,* 87 T.C. 926 (1986); *James v. Commissioner,* 87 T.C. 905 (1986), on appeal (10th Cir., June 22, 1987 and June 25, 1987); *Coleman v. Commissioner,* 87 T.C. 178 (1986), affd. without published opinion 833 F.2d 303 (3d Cir. 1987); *Estate of Thomas v. Commissioner,* 84 T.C. 412 (1985); *Rice's Toyota World, Inc. v. Commissioner,* 81 T.C. 184 (1983), affd. in part 752 F.2d 89 (4th Cir. 1985). A two-pronged test has emerged. Under this test, we must disregard such transactions if we find "that the taxpayer was motivated by no business purposes other than obtaining tax benefits in entering the transaction, and that the transaction has no economic substance because no reasonable possibility of a profit exists." *Torres v. Commissioner,* 88 T.C. at 718, quoting *Rice's Toyota World, Inc. v. Commissioner,* 752 F.2d at 91.

Petitioner does not seriously contend that the transaction had a purpose apart from tax savings. Petitioner's witnesses all protested that tax considerations were not a

major or primary factor in petitioner's decision to invest in the equipment. They did not, however, identify any other motivating consideration that can be given credence. Thus we give greater weight to objective factors and conclude that petitioner's tax objective was the only real purpose of the transaction. See sec. 1.183-2(a), Income Tax Regs. Petitioner's knowledge of the computer industry was minimal and its evaluation of the proposed transaction was anything but businesslike. Schanback, an experienced businessman, purportedly committed petitioner to a multimillion dollar transaction on the strength of three indicia of residual value: (1) Mallin's estimate, (2) a letter from Alexander Grant & Co., and (3) a transaction entered into by Peerless in 1978. Mallin, a salesman who stood to receive a substantial commission, was obviously biased. The Alexander Grant letter does not describe any particular manufacturer or model of computer and assumes a lease term of 7 years, not the 9-year term used by petitioner. As for the allegedly similar Peerless transaction, the record contains no evidence of the manufacturer, model, or lease term involved. On cross-examination, Schanback admitted that petitioner would not have entered into this transaction but for the promised investment tax credit. Taken as a whole, the record indicates and we conclude that petitioner was motivated by a package of expected tax benefits.

Petitioner's transaction also fails to qualify as a transaction having profit potential. In this case, as in most computer purchase and lease cases, the possibility of economic profit was dependent upon the expected residual value of the equipment at the end of the lease term. Assuming petitioner's most optimistic projection of residual value, without the investment tax credit, petitioner's transaction could not have yielded an economic profit. Petitioner attempts to avoid this result by arguing that the investment tax credit must be viewed as a reduction in the cost of the equipment. If the credit were so taken into account, petitioner's transaction would yield a profit if the equipment retained a residual value as low as 16 percent. Respondent argues that the investment tax credit cannot be

considered in the determination of economic substance.[2]

In *Fox v. Commissioner*, 82 T.C. 1001, 1020-1021 (1984), we concluded that section 165(c)(2) requires a primary profit motive if a loss from a particular transaction is to be deductible. We described the origin of the "primary" standard in relation to deductions claimed under section 165. We also observed, however, that:

> Petitioner * * * points out that a multitude of transactions which are likely to be motivated primarily by tax reasons is nonetheless sanctioned under the tax laws. Examples of such transactions are the purchase of tax-exempt securities; purchases of property motivated by the availability of accelerated depreciation, the investment credit, and the deductibility of interest; safe-harbor leasing; renovation of historic structures; location of subsidiaries in Puerto Rico because of tax credits; acquiring interests in low income housing partnerships; and many others. Indeed, some of these transactions are arguably *solely* tax motivated.
>
> We acknowledge that many such tax-motivated transactions are congressionally approved and encouraged. We therefore relax our holding that section 165(c)(2) permits loss deductions only from transactions entered into primarily for profit to allow for those essentially tax-motivated transactions which are unmistakably within the contemplation of congressional intent. The determination whether a transaction is one Congress intended to encourage will require a broad view of the relevant statutory framework and some investigation into legislative history. The issue of congressional intent is raised only upon a threshold determination that a particular transaction was entered into primarily for tax reasons.
>
> [82 T.C. at 1021.]

A similar analysis is appropriate here.

The investment tax credit was the centerpiece of the Revenue Act of 1962, Pub. L. 87-834, 76 Stat. 960, 1962-3 C.B. 111 et seq. Congress enacted the credit as part of a program designed to stimulate the economy and encourage capital investment. The other major element of this program was the Treasury Department's reduction in the depreciable lives of capital assets. H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 405, 412; S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 707, 717-718. At no point does the legislative history of the act distinguish

---

[2]The parties each presented expert testimony concerning the equipment's expected residual value. Petitioner's experts opined that petitioner's assumptions were reasonable. Respondent's expert testified that the equipment would have no residual value at the end of the lease term. In view of our resolution of this case, we need not reconcile the conflicting views of the parties' experts.

between accelerated depreciation as a tax benefit and the investment tax credit as a non-tax or economic benefit.

That Congress chose to cast this tax incentive in the form of a credit rather than a deduction is immaterial. The Senate Finance Committee observed that "the statement sometimes made that the credit is a subsidy overlooks the fact that other alternatives, such as faster depreciation, for example, share the same characteristics of giving the investor in equipment a monetary reward beyond what he would receive on the basis of realistic accounting." S. Rept. 1881, *supra*, 1962-3 C.B. at 718. Although Congress was aware of the capital investment deduction then available in much of Europe, lawmakers felt that a credit was preferable because it would provide equal tax benefit to all businesses. Statement of the Honorable Douglas Dillon, Secretary of the Treasury, Hearings Before the Senate Committee on Finance on the Revenue Act of 1962, H.R. 10650, 87th Cong., 2d Sess., (Part 1) 79-80 (1962). Congress also concluded that a capital investment deduction would distort income accounting by producing higher costs for book purposes, which were expected to be passed on to consumers in the form of higher prices. S. Rept. 1881, *supra*, 1962-3 C.B. at 718. In short, the investment tax credit was enacted as a credit rather than as a deduction for reasons of tax policy. The credit was not intended to serve as a substitute for economic profit.

Petitioner quotes from the House and Senate committee reports to support its contention that the investment tax credit must be seen as nothing more than a reduction in the cost of a capital asset. Petitioner ignores the context in which the statements quoted in its brief are made. The House Report states that the credit "will stimulate additional investments since it *increases* the expected profit" from the use of depreciable assets. H. Rept. 1447, *supra*, 1962-3 C.B. at 412. Emphasis supplied. The Senate Report states that the credit "will stimulate investments, first by reducing the net cost of acquiring depreciable assets, which in turn *increases* the rate of return after taxes arising from their acquisition." S. Rept. 1881, *supra*, 1962-3 C.B. at 717. (Emphasis supplied.) At no point do the committee reports indicate that the credit was intended to transform unprofit-

able transactions into profitable ones. As the House and Senate reports each state, funds freed by the credit were expected to be used for new investment. H. Rept. 1447, *supra*, 1962-3 C.B. at 412; S. Rept. 1881, *supra*, 1962-3 C.B. at 717. Where the credit represents the difference between a profit and a loss, the amount of the credit necessary to recover the loss is not reinvested in the economy, as Congress contemplated.

Our conclusion is consistent with decisions in many previous cases. On no occasion has this Court, or any other court, intimated that the investment tax credit should be considered in analyzing a sale and leaseback transaction for economic substance.

The cases upon which petitioner relies are inapposite. In *Freesen v. Commissioner,* 798 F.2d 195 (7th Cir. 1986), revg. 84 T.C. 920 (1985), the issue was the applicability of the noncorporate lessor provisions of section 46(e)(3). The Court of Appeals observed that:

> The credit, like other subsidies, may even have deleterious effects. A business compares the cost of an asset against the value of the income the asset will produce. When the asset is worth even a little more than the cost, it is beneficial to the business and the economy alike. But what if the value is a little less than the cost and there is an investment tax credit? If a business uninfluenced by the combination of taxes and tax subsidies would not make a purchase, it should not be made. Yet this business might buy the asset if the credit were large enough and the business either had tax liability that the credit could offset or could sell the credit to a firm that did. [798 F.2d at 198.]

The appellate court did not, however, suggest that this type of analysis was appropriate to the determination of whether a transaction should be recognized for tax purposes. In *Xerox Corp. v. United States,* 228 Ct. Cl. 406, 656 F.2d 659 (1981), the issue was the availability of the credit in the context of use by tax-exempt organizations and governmental units described in section 48(a)(4) and (5). In *Torres v. Commissioner,* 88 T.C. 702 (1987), the Commissioner argued that a 7-percent discount should be applied to the fair market value of used computer equipment because a 7-percent investment tax credit was then available on similar new equipment. Because the taxpayer conceded this issue, we did not address the appropriateness of the Commissioner's analysis. Moreover, although the investment tax credit

may be relevant to fair market value when determining, as in *Torres*, whether a taxpayer has assumed the burdens and benefits of ownership, that fact does not transform the credit into anything other than a tax benefit.

As we said in *Beck v. Commissioner,* 85 T.C. 557, 579-580 (1985),

To some extent tax incentives, such as accelerated depreciation and investment tax credit, are designed to stimulate the formation of venture capital. Such incentives are not intended, however, to create a new economy consisting of paper transactions having no relationship to the real value of goods and services. Thus, the mere presence of a valid business enterprise at some levels of a transaction does not automatically entitle passive investors distant from day-to-day operations of the enterprise to the associated tax benefits. * * *

In this case, petitioner was not purchasing, and O.P.M. was not selling, computer equipment or profit-oriented investments. Simply put, O.P.M. was selling, and petitioner was buying, an investment tax credit. The authorities cited by petitioner for the proposition that the investment tax credit is regarded as a reduction in cost all assume that the credit is obtained by a taxpayer that will employ the equipment in a profit-making activity. The availability of the credit was not here an incentive to Polk, the user, to acquire capital goods. It would be a distortion of congressional intent to conclude that it was intended that petitioner be induced to engage in a paper transaction that did not in any way affect the demand for computer equipment. We are not persuaded that Congress intended that a taxpayer in petitioner's position "profit" from the investment tax credit. Because the transaction had no other purpose and could not have resulted in economic profit, it was lacking in economic substance and cannot be recognized for tax purposes.

Because petitioner's transaction lacked economic substance, petitioner's deductions for depreciation and interest on its long-term note, as well as its claimed investment tax credit, must be disallowed. *Rice's Toyota World, Inc. v. Commissioner, supra.* Although petitioner is entitled to deduct the interest on its short-term notes (*Rice's Toyota World, Inc. v. Commissioner, supra; Rose v. Commissioner,* 88 T.C. 386, 423 (1987), on appeal (6th Cir., Dec. 14, 1987)), the record contains no evidence suggesting that any portion

of petitioner's interest deduction for the year in issue was attributable to such interest. The entire deduction for interest must thus be disallowed.

Section 6621(c), formerly 6621(d), provides for an increase in the rate of interest accruing on tax underpayments where there is a "substantial underpayment" (an underpayment exceeding $1,000) in any taxable year attributable to tax-motivated transactions. Tax-motivated transactions are defined in section 6621(c)(3) to include "any sham or fraudulent transaction." Transactions devoid of profit motive and economic substance are sham transactions within the meaning of section 6621(c)(3)(A)(v). *Cherin v. Commissioner,* 89 T.C. 986, 1000 (1987); *Patin v. Commissioner,* 88 T.C. 1086, 1128-1129 (1987), currently on appeal. Because petitioner's underpayment exceeded $1,000 and was attributable to a tax-motivated transaction, petitioner is liable for the increased rate of interest.

*Decision will be entered for the respondent.*