JOSEPH KABA AND ILONA KABA, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kaba v. Commissioner
Docket No. 24016-86.
United States Tax Court
T.C. Memo 1989-148; 1989 Tax Ct. Memo LEXIS 148; 57 T.C.M. (CCH) 25; T.C.M. (RIA) 89148; April 5, 1989
Joseph and Ilona Kaba, pro se. Richard J. Wood and Robert N. Trgovich, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: The issues in this case involve the propriety of advance rental and other deductions, and investment and energy tax credits, claimed by petitioners with respect to the lease of an energy management unit from OEC Leasing (OEC). Respondent determined a deficiency in petitioners' 1982 income taxes of $ 11,018, an addition to tax under section 6653(a)(1) [1] of $ 550.90 plus 50 percent of the interest on the income tax deficiency under section 6653(a)(2), *150 an addition under section 6659 of $ 3,305.40, and the increased rate of interest on tax motivated transactions under section 6621(c), all related to the OEC venture. Respondent, in an amendment to his answer, also seeks application of the section 6661 addition for substantial understatement of income tax. FINDINGS OF FACT Petitioners resided in Los Angeles, California, when their petition was filed in this case. The stipulation of facts and attached exhibits are incorporated herein by this reference. During the year in issue, Joseph Kaba (petitioner) was employed in California by the Walt Disney Company working on the EPCOT center. He was engaged in the field of audioanimatronics, work that necessitated sculpture ability and some experience in electronics. Petitioner also experimented in the energy field, especially with photovoltaic energy generation (solar cells). Petitioners have no expertise in the area of energy management equipment leasing. The OEC transactions, as will be discussed in more detail below, involved the lease by a taxpayer of *151 an energy management device from OEC Leasing, followed by its installation by a service company in the facility of an end user. Any energy savings would be split by the end user, the taxpayer, the service company and OEC. George Falvy (Falvy) was the agent or broker for the OEC investment who originally brought it to the attention of petitioners. Falvy provided petitioners with OEC promotional materials, which they relied upon in making their investment. These materials included a chart showing that the lessee of an Energy Minder System I (EMS I) could anticipate $ 15,500 in tax benefits in the year of acquisition. The promotional materials also included two appraisals, one by Nicholas Arteca, an engineer, and one by George Lemonides, an architect, stating that the units were worth the values claimed by OEC. The Lemonides appraisal also stated that a 15-percent average increase in energy costs was reasonable, and that a 20-percent energy savings rate was also reasonable. The Arteca appraisal warned that a number of variables would affect profitability, including installation site, annual energy bills, increase in fuel prices, and technological advances. Although petitioner *152 Joseph Kaba was enthused about the program, petitioner Ilona Kaba was more skeptical. Petitioners paid an attorney $ 60 to review the promotional materials. The attorney apparently advised petitioners that if the project did not work out, it would be like a "loan" from "Uncle Sam" that would have to be repaid with interest. In addition, petitioner talked with some of his co-workers about the investment. However, petitioner primarily relied upon Falvy and the information he provided. On December 20, 1982, petitioner entered into a lease agreement for an EMS I. He paid $ 5,000 first year's advanced rental. Petitioner also entered into a service agreement with Control Technology, Inc. (Control), agreeing to pay Control $ 1,000, plus 15 percent of petitioner's share of any energy savings, to install and operate the system. He paid the first installment of the installation fee, $ 250, and $ 100 for insurance in connection with the OEC investment in 1982. The remaining installation fee would be paid upon Control's finding a suitable location and installing the energy saving unit. In addition, Falvy and petitioner entered into a Business Supervision Agreement, whereby Falvy would *153 supervise petitioner's OEC investment, at no additional cost. Petitioners were aware of the effect of the promised tax credits when making the OEC investment. On their Federal income tax return for 1982, petitioners deducted $ 5,000 advanced rent, $ 250 installation fee and $ 100 insurance. They also claimed a $ 6,500 investment tax credit and a $ 6,500 energy tax credit based upon the OEC's purported $ 65,000 cost. Petitioners were only able to use $ 8,932 of the $ 13,000 credit, and carried back the remainder to taxable year 1979 in a tentative claim for refund. Petitioners received a letter from Control dated March 9, 1983, indicating that their unit had been delivered prior to December 31, 1982, and that Control was in the process of finding a suitable installation location. Petitioners then received a letter dated June 1, 1983, from Control indicating Control had assigned all its rights under petitioners' service contract to Weatherman Controls, Inc. (Weatherman). Weatherman, by letter dated March 26, 1984, indicated that petitioners' equipment was "inadequate to perform effectively for the purpose intended," and that it had been shipped back to OEC for corrective action. *154 Apparently, sometime in 1984, petitioners received correspondence from one Charles Reitz of Western Financial Management (WFM), asking lessees of OEC equipment to sign a power of attorney allowing WFM's counsel to make demands upon OEC and/or the service companies. Apparently, the energy management devices, including the one leased by petitioners, had not been installed due to incompetent service or malfunctioning equipment. WFM's counsel apparently instituted a class action suit against OEC and its affiliates, alleging securities fraud, and asked investors to contribute $ 250 to its prosecution. The outcome of the lawsuit, or whether petitioners contributed to its prosecution, is not in the record. The mechanics of the OEC transaction are identical in most respects to the transactions described in Soriano v. Commissioner,90 T.C. 44 (1988), and Heasley v. Commissioner,T.C. Memo. 1988-408. Briefly, it involved the purchase by OEC of devices to save energy in industrial and commercial facilities. These would be leased to investors, who in turn were to have them installed and serviced by an unrelated service company in the facility of a third-party *155 end user. Any energy savings would be split by the investor and the end user, with a percentage of savings retained by the service company as service fees and OEC as rental payments. The energy savings would be retained by the participants in the following percentages: End-User: 50 percent
Service Company: 7.5 percent
Lessor (OEC): 31.88 percent
Lessee (Kabas): 10.62 percent
The end user was not required to make any payments, other than sharing energy savings, in connection with their use of the devices. Prior to installation, the service company would conduct an "energy audit" to determine a suitable end user location. The investor would also pay initial amounts for the first year's rental and an installation charge. The investor/lessee claimed tax deductions for advanced rental and installation charges, and investment tax credits, under section 48(d), based on the purchase price OEC paid for the units. The units themselves are electronic devices designed to regulate oil, gas, steam and electrical usage, thereby conserving energy to the end user. There are a number of such devices on the market. The cost of such a system is based upon its capabilities *156 and the number of functions it can perform. Respondent's expert's report [2] explains these factors in greater detail and we quote from it below: EXPLANATION OF ENERGY MANAGEMENT SYSTEM TERMS a. Number of points. A point is a physical device in the building which operates an actuator or starter [load] or measures a temperature, status or similar parameter. The number of points a system can control or monitor is the most fundamental characteristic of a system for it establishes the system size. More points translates to more control, larger buildings and larger savings. Typical points for a system are: on-off control of a fan motor starter on-off control of a pump motor starter on-off control of a lighting contactor status input of a fire alarm status input of a fan failure temperature measurement of the outdoor air temperature measurement of the space. b. Functions performed. The functional capability of a system *157 defines the extent to which the system can conserve energy and perform other tasks. Typical capabilities of systems include: Duty cycling: periodically switch equipment off for short periods of time Time-of-day: switch equipment on/off on a scheduled basis using the calendar, day of week or time of day Demand limiting: switch equipment off for short periods in order to avoid excessive (peak) electrical usage Temperature compensation: duty cycling and demand limiting can be enhanced by compensating for room temperatures Record keeping: maintaining data on utility or temperature measurements Optimum start-stop: using measured outdoor and indoor temperatures to determine the optimum equipment start-up or shutdown Remote access: interface to the EMS by telephone using a terminal and modem Enthalpy optimization: controlling outdoor dampers on air handling units to minimize cooling Load prediction: anticipate cycling of loads and its effect on electrical demand Low level user programing [sic]: allow for the user to define a few unique sentences using an internal language Simple building security: monitor alarms on a secondary basis and notify appropriate terminals
*158 Custom applications: special sequences established to control large equipment such as chillers and boilers Maintenance management: provide equipment database, work orders, manning reports and other related reports Full HVAC [Heating, Ventilation, Air Conditioning] control (Direct Digital Control (DDC)): closed loop control using a sensor and analog output to maintain temperatures Full Fire and Security: approved primary monitoring of fire and security sensors Higher level programming: Fortran, Basic or other higher level language programming. c. User Interface. The user interface impacts the ease with which the user can program the above functions and monitor the results. The types of interface are: LED [3] with Keypad: The most basic user interface is a keypad with the digits 0-9 and a few other function keys and a two to six digit LED display. Often with such an interface LED point lights are used to indicate on-off status or indicate the next programming operation to take place. ASCII terminal: An ASCII terminal is a standard computer terminal *159 with a QWERTY keyboard and CRT display or hardcopy display. This type of interface typically allows for prompting for program inputs and simple reports. Multi-terminals: This type of system allows more than one person to be using the system at a time. For example, one person may be checking the status of equipment and the other may be changing schedules. Colorgraphics terminals: A colorgraphics terminal displays equipment schematically with realtime temperatures and status in appropriate locations. The salient features and stated cost of the EMS I (1982 model) are tabulated below: EMS I
Points:
4
Functions:
Duty cycling
Time-of-day
Interface: LED w/keypad
ASCII Terminal
Designated
$ 65,000
Cost:
Cost per Point:
$ 16,250
The average cost per point for a random sampling of small units (4-125 points) is $ 305; medium units (50-750 points) averaged $ 230 per point; large custom units (500-2000 + points) vary from $ 500 to $ 1,200 per point. [4] In the general market place, the most expensive units were $ 8,213 (small) and $ 20,000 (medium). Large units must be custom built and may cost $ 50,000 or more. Installation *160 charges may double the cost of a system. The energy management system market is a large market, heavily advertised in the trade. A small unit comparable to the EMS I could have been purchased for about $ 1,500 in 1982. The fair market value of the EMS I (1982 model) is $ 1,500. The ultimate profitability of the venture to OEC and its lessees was dependent upon a number of factors, including the initial advanced rental and installation expenditures, annual energy bill, actual cost savings to the end user, the rate of inflation for energy costs, and useful physical and economic life of the equipment. The advanced rental for an EMS I was $ 5,000 per unit, while installation was $ 1,350. [5] The minimum annual energy bill which would justify use of the EMS I was $ 20,000. Based on a 1982 Department of Energy (DOE) report, energy costs were forecast to increase, on the average, 3.8 percent (electricity - 2.0 percent, gas - 9.1 percent, oil - 4.3 percent). This is a weighted average for the typical industrial/commercial fuel combination. Considering *161 a 7-percent inflation rate, the annual rate of energy cost increase would be 10.8 percent. DOE reports for earlier periods had projected cost increases of some 20 percent. Actual energy savings to a particular end user may vary significantly, depending on physical characteristics of the facility and energy conservation measures which may already have been taken. Industry reports predicted 5 to 12-percent savings with a maximum of approximately 20 percent. Actual savings are often less than projected. We agree with respondent's expert that 10 percent is a reasonable assumption. We must also evaluate the useful physical and economic life of the devices. Optimistic estimates of the engineering useful life of these units is 20 to 25 years. Engineering or physical useful life is the length of time the unit may remain operational with normal repairs. The units in question were warranted for only 1 year. Electronic equipment is also subject to obsolescence (economic *162 useful life); while the unit is still operative, it may nonetheless be more cost-effective to replace it with newer, more efficient technology. These units are also subject to obsolescence or failure of the underlying climate control units (central heating or air conditioning units). When these are replaced the new units often incorporate internal energy management control systems. Thus, we conclude, as did respondent's expert, that these devices have a useful life of approximately 10 years. Using these assumptions, one can obtain projected cash flows for the lease of an EMS I unit. Discounting this future cash flow to present value, to take into account the time value of money, is a way we have used to measure the economic viability of these transactions. See Soriano v. Commissioner,90 T.C. 44 (1988); Heasley v. Commissioner,T.C. Memo. 1988-408. The discount rate reflects the risk of the venture and expected return. The prime rate in 1982 was approximately 15 percent. This is a considerably riskier venture due to chances of equipment failure, energy cost variability and failure to achieve expected savings. Twenty percent would be a minimum *163 rate of return. In the industry, these systems are expected to pay back in 1 to 3 years, an approximate 30-percent return. Using the 20-percent rate, the discounted cash flow from the lease of an EMS I, consisting of anticipated payments from end users less advanced rental and installation fees, is a negative $ 3,366 as computed by respondent's expert. [6] Thus, the lease of a unit is not an economically viable transaction. *164 OPINION This case involves the propriety of deductions and credits claimed with respect to petitioners' lease of an energy management device, and additions to tax related to the disallowed deductions and credits. The transactions herein are similar to those already dealt with by this Court in Soriano v. Commissioner, supra, and Heasley v. Commissioner, supra, and suffer from many, if not all, of the same infirmities. An otherwise normal product or service, with a facially appealing and effective marketing approach, has been grossly distorted to achieve tax benefits and remove any underlying economic support. A common threshold for the claimed tax benefits is that the taxpayer must be engaged in a trade or business or in a transaction entered into for profit. Otherwise, no credits or losses are allowed. Sec. 183. Essential to such a showing is a demonstration that petitioners had an actual and honest objective of making a profit, giving greater weight to objective facts than petitioners' mere statements of intent. Soriano v. Commissioner, supra at 53; Beck v. Commissioner,85 T.C. 557 (1985); Siegel v. Commissioner,78 T.C. 659 (1982); *165 Dreicer v. Commissioner,78 T.C. 642 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). The same or similar objective factors have been used to test both profit objective and economic substance of a transaction. Rose v. Commissioner,88 T.C. 386 (1987), affd.    F.2d    (6th Cir., Feb. 27, 1989). Rather than repeat our discussion in the Soriano case, we list below the objective and subjective factors indicating that petitioners did not have the requisite profit objective. Profit means economic profit, independent of tax savings. Friendship Dairies, Inc. v. Commissioner,90 T.C. 1054 (1988); Herrick v. Commissioner,85 T.C. 237 (1985); Surloff v. Commissioner,81 T.C. 210 (1983). The investment tax credit is not a substitute for or component of economic profit. Friendship Dairies, Inc. v. Commissioner, supra.Therefore, we find it most probative that the discounted cash flow from the transaction, using objective assumptions, would be a negative $ 3,366. In other words, the $ 6,350 "price" ($ 5,000 advanced rental plus $ 1,350 installation) was *166 approximately twice the present value of the expected future income stream, $ 2,984 (-3,366 discounted cash flow plus 6,350 price). There would be wide variability in energy savings based on factors not in petitioners' control, including rate of energy savings, energy prices, and the installation site. Petitioners did not take an active interest in this all-important part of their investment. Rather, they passively relied on Control and Falvy, and did nothing after the initial investment. We would expect some minimal supervision activity, some care in assigning duties to others, in order to find a bona fide profit objective. See Flowers v. Commissioner,80 T.C. 914, 932 (1983). Petitioners did not obtain independent appraisals or other reports, nor did they do much, if any, outside investigation. While petitioner was familiar with alternative energy conceptually, especially in the area of solar cells, he did not have any experience in practical application of the devices at issue. Petitioners did not have expertise in the area of energy management equipment leasing. In addition, while petitioner's co-workers apparently thought it was a good idea, the record *167 does not contain the content of their discussions, or whether they were directed toward verifying the figures provided by the promoters. Some independent indicator of profitability would be a most probative element in finding a profit objective, and that is lacking in this case. See Beck v. Commissioner, supra;Elliott v. Commissioner,84 T.C. 227, 240 (1985), affd. without published opinion 782 F.2d 1027 (3d Cir. 1986). The units ultimately did not generate any income for petitioners. See sec. 1.183-2(b)(6), (7), Income Tax Regs. Further, there is no evidence that the unit was ever installed, and there is considerable doubt whether it was operational. Finally, the first year's advanced rental exceeded the fair market value of the entire system. Based on the foregoing, we find that petitioners did not have an actual and honest profit objective with respect to the energy management lease, and no deductions or credits will be allowed. Soriano v. Commissioner, supra.
Petitioners' case also contains other defects, similar to Soriano v. Commissioner, supra. Because the fair market value of the EMS I is *168 only $ 1,500, the pass through of the investment and energy tax credits would be limited to 10 percent of that amount. Sec. 48(d)(1)(A). There was a large market for these devices, and this market was the most appropriate barometer of fair market value. While respondent's expert admitted that installation charges could double the cost of a system, petitioners have not shown or argued that these charges would be permitted as part of the base for the energy or investment tax credits. Moreover, even if the value were doubled, it would not approach the amounts claimed by petitioners on their return, or materially reduce the deficiency. Because no installation ever occurred, no energy credits would be allowed. Specially defined energy property must be installed in connection with an existing industrial or commercial facility. Sec. 48(1)(5). Finally, paying one year's advance rent in an amount in excess of the value of the entire system is not an ordinary or necessary business expense within the meaning of section 162. Soriano v. Commissioner, supra at 59. Therefore, as in Soriano v. Commissioner, supra, we find that no credits or deductions are *169 allowable. The same economic distortion that was present in that case is present here. "[W]e cannot ignore the artificial inflation of the claimed value of the units * * *. Petitioners could have readily determined the fair market value of these units and, in the same manner, verified the assumptions and values asserted by the promoters." Soriano v. Commissioner, supra at 60. The Kabas are sincere people, but the simple fact is that they have sought investment and energy tax credits based upon grossly inflated values. Whether or not petitioners are without specific intent to evade or avoid tax, they remain responsible for the report of tax to the Government. Respondent also determined additions to tax under section 6653(a)(1) and (2) for negligence. Negligence is the lack of due care or the failure to do what a reasonable or ordinarily prudent person would do under the circumstances. Marcello v. Commissioner,380 F.2d 499, 506 (5th Cir. 1967), cert. denied 389 U.S. 1044 (1968). Petitioners bear the burden of showing they were not negligent. Petitioners claimed substantial deductions and credits based solely upon values asserted *170 by the promoters. In addition, while petitioner had some experience in the energy field, he is not an expert in energy management equipment leasing. Petitioners also received advice from an attorney that if the transaction did not work out (apparently meaning did not have the intended tax effects), it would be like a loan that would have to be repaid to the Government. Petitioners did not attempt to independently verify the assumptions and claims made by the promoter, including valuation of the unit, which exceeded 4000 percent of fair market value. In light of the extraordinary inflation of the units, and the dubious tax advice given to petitioners, they were negligent with respect to the underpayments caused by the OEC transaction. We next consider the addition to tax determined for valuation overstatements. Section 6659 provides for an addition to tax equal to 30 percent of the underpayment of tax attributable to an overvaluation of more than 250 percent. The underpayment must be more than $ 1,000. Sixty-five thousand dollars is substantially more than 250 percent of $ 1,500, the value of the EMS units. The disallowed credits for 1982 result in underpayments of more than *171 $ 1,000. Thus, the section 6659 addition would mechanically apply to the disallowed credits. Soriano v. Commissioner, supra at 60. Respondent, by amendment to his answer, asserted a section 6661 addition for substantial understatement of income tax regarding the portion of the deficiency not related to the valuation overstatement--the advanced rental and other deductions. The section 6661 addition is adjusted for that portion of the understatement attributable to a valuation overstatement. Sec. 6661(b)(3). An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1)(A). The $ 11,018 deficiency meets this substantiality requirement, thus the addition applies. Of the $ 11,018 deficiency, $ 8,932 is attributable to a valuation overstatement, i.e., the disallowed credits. Therefore, the remainder, $ 2,086, is subject to the section 6661 addition. Section 6661(c) permits respondent to waive the addition if the taxpayer shows reasonable cause and good faith regarding the understatement. The advanced rental deductions exceeded the normal purchase price of similar property. Thus, *172 we find that there was no reasonable cause for petitioners' substantial understatement of their income tax liability. Section 8002(b) of the Omnibus Budget Reconciliation Act of 1986, Pub. L. 99-509, 100 Stat. 1874, 1951, increased to 25 percent the addition for substantial understatement, effective for additions assessed after October 21, 1986. Because the addition will be assessed after that date, the 25-percent rate applies. Pallottini v. Commissioner,90 T.C. 498 (1988). The final issue is the interest imposed on tax motivated transactions imposed by section 6621(c). [7] The increased rate of interest is 120 percent of the statutory rate imposed on underpayments. Sec. 6621(c)(1). A tax motivated transaction includes any valuation overstatement, as defined in section 6659. Sec. 6621(c)(3)(A)(i). The underpayment attributable to the transaction must exceed $ 1,000. Thus, with respect to the underpayments attributable to the disallowed credits, the increased rate of interest applies. Sec. 6621(c)(1). *173 We must next decide whether the increased rate of interest applies to the disallowed advanced rental and other expenses. The Commissioner has the authority to specify other types of transactions that will be treated as tax motivated. Sec. 6621(c)(3)(B). Deductions disallowed for any period under section 183 relating to an activity not engaged in for profit are included in respondent's temporary regulations, sec. 301.6621-2T Q-4, Temp. Proced. and Admin. Regs., 49 Fed. Reg. 59394 (Dec. 28, 1984). See Patin v. Commissioner,88 T.C. 1086 (1987), affd. without published opinion sub nom. Hatheway v. Commissioner,856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner,864 F.2d 93 (9th Cir. 1989), affd. sub nom. Gomberg v. Commissioner,    F.2d    (6th Cir. 1989). We have previously disallowed the deductions and credits related to the OEC activity because it was not engaged in with the requisite profit objective. Thus, the increased rate of interest applies to the advanced rental and other expenses. To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year at issue.↩
2. The reports of respondent's experts in this case, Soriano v. Commissioner,90 T.C. 44 (1988), and Heasley v. Commissioner,T.C. Memo. 1988-408↩, are similar, and in many respects are identical.
3. Light emitting diode. This is apparently similar to the red or green on black display on a calculator.↩
4. We use figures provided in respondent's expert's report. Costs are list price using 20 units (small) and 5 units (medium).↩
5. This figure, provided in the promotional materials by OEC, is $ 350 more than the price charged by Control in petitioners' service contract. However, this difference is not critical to the outcome in this case.↩
6. We will briefly explain the methodology used by respondent's expert in reaching his conclusions. Discounted cash flow equals lessee's discounted percentage of energy savings minus advanced rental and installation expenses. The starting point for total energy savings is the minimum annual bill. This is projected into the future using the anticipated energy inflation rate, i.e., $ 20,000 x 10.8 percent = $ 22,160--the energy bill for year 2; $ 22,160 x 10.8 percent = $ 24,553--the energy bill for year 3, and so on. The energy savings rate is then applied to each year's annual energy bill, resulting in total projected energy savings. The lessee is entitled to 10.62 percent of this figure. The lessee's portion of savings is then discounted to present value using a 20-percent rate of return. The projection is extended for 10 years into the future, the anticipated useful life of the machines. Because the rate of return is built-in to the discount rate, any discounted cash flow greater than or equal to zero produces an economic profit.↩
7. Prior to the Tax Reform Act of 1986, subsec. (c) was designated subsec. (d). Sec. 1511(a), Pub. L. 99-514, 100 Stat. 2085, 2744. The additional interest applies only after Dec. 31, 1984, and notwithstanding that the transaction was entered into prior to that date. Solowiejczyk v. Commissioner,85 T.C. 552 (1985), affd. per curiam without published opinion 795 F.2d 1005↩ (2d Cir. 1986).