ALFONSO M. AND JENNIE PACHECO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; PAUL P. AND CINDY J. BORNHAGEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Pacheco v. Commissioner
Docket Nos. 12184-86; 20611-86.
United States Tax Court
T.C. Memo 1989-296; 1989 Tax Ct. Memo LEXIS 308; 57 T.C.M. (CCH) 739; T.C.M. (RIA) 89296; June 19, 1989; As corrected July 3, 1989 Michael J. Freeman, for the petitioners. Alan G. Merkin, for the respondent. WILLIAMS
MEMORANDUM FINDINGS OF FACT AND OPINION WILLIAMS, Judge: In these consolidated cases, the Commissioner determined deficiencies in petitioners' Federal income tax for the taxable year 1984 and additions to tax as follows: Additions to Tax
Deficiency
§ 6653(a)(1) [1]
§ 6653(a)(2)
§ 6659
Alfonso M. and Jennie
$ 8,707
$ 435.35 * $ 2,612.10
Pacheco
Paul P. and Cindy
6,267
313.35 **
1,880.10
Bornhagen
*309 The issues before us are (1) whether petitioners are entitled to deduct expenses incurred in connection with the lease and sublease of an energy management system; (2) whether petitioners are entitled to investment tax credits and energy tax credits with respect to the leased equipment; (3) whether additions to tax pursuant to sections 6653(a)(1), 6653(a)(2) and 6659 are warranted; and (4) whether petitioners are liable for additional interest pursuant to section 6621(c). These cases were selected by counsel as test cases for petitioners who leased equipment similar to petitioners' leased equipment in transactions similar to the transactions in these cases known as the American Energy Systems Leasing, Inc. ("AES") leasing program. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners Alfonso M. and Jennie Pacheco, husband and wife, resided in Denver, Colorado, at the time their petition in docket No. 12184-86 was filed. Alfonso Pacheco *310 ("Pacheco") was a meat cutter during part of 1984 and a business representative for a union during part of 1984. Jennie Pacheco was a cashier in 1984. Petitioners Paul P. and Cindy J. Bornhagen, husband and wife, resided in El Toro, California at the time their petition in docket No. 20611-86 was filed. During 1984, Paul Bornhagen ("Bornhagen") was a conductor and a brakeman for a railroad. Cindy Bornhagen was a dental assistant during the same time period. None of the petitioners were experienced in energy management or in leasing equipment. The principal participants in the transactions in these cases were American Energy Services, Inc. ("AES") and Sol Tech Manufacturing ("Sol Tech"). AES was a closely held Delaware corporation, incorporated in 1984, when the transactions at issue took place. AES promoted the energy management systems equipment leasing program in which petitioners acquired leases of undivided interests in energy equipment. The plan, generally, was for Sol Tech to manufacture energy management systems and sell them to AES for cash and notes. AES then would lease (registered) the systems to investors. The investors were to sublease the systems to end users *311 in return for half of the users' energy savings generated by the systems. The investors would pay rent to AES with the income from the energy savings, and AES would pay on its notes to Sol Tech with the rental income from investors. An energy management system controls energy usage in a building by controlling equipment such as air-conditioning, heating, ventilation and lighting. A system utilizes a microprocessor which is powered by some external electrical energy source. The microprocessor contains relays, or switches, that control the energy equipment at points. A "point" is a designation for any physical device in a building that operates a starter or measures temperature, status, or a similar variable. Typical points for a system include the on-off control of a fan motor starter, the on-off control of a lighting contractor, and the temperature measurement of indoor or outdoor air. The controlled equipment is powered by electricity. A system typically is used to periodically switch equipment on and off on a schedule according to the day of week or time of day. AES offered two different models of the energy management systems for lease to investors: (1) Solarcon/Solartron *312 800 ("Solarcon 800") and (2) Solarcon/Solartron 1600 ("Solarcon 1600"). The Solarcon 800 and 1600 both are based on the same En-Log microprocessor which has four relays. Modules of four relays are added in banks to get eight or 16 relays. The Solarcon 800 has eight relays that can control eight points, the Solarcon 1600 has 16 relays that can control 16 points. The two systems thus are identical except that the Solarcon 1600 has additional relay modules. The Solarcon 800 and 1600 each have an extra set of relays outside the microprocessor powered by a solar panel. Instead of the relays in the microprocessor controlling the points, the relays in the microprocessor control the solar powered relays which then control the points. The solar components (the photovoltaic panel, battery, relays and associated mounting hardware) in the Solarcon 800 and 1600 are used for no purpose other than to power this extra set of relays. The solar components did not power either the microprocessor or the controlled equipment in any energy management system. In the case of a power failure, the microprocessor and the controlled equipment did not function; the microprocessor contained its own small *313 battery to avoid losing its program. The solar components of the Solarcon 800 or 1600 are irrelevant for any energy management function. Indeed, the solar powered relays add another possibility of relay failure which in fact reduces the systems' reliability and capacity to save energy. The solar components of the system, the solar "flap," were appended to an already functional system and do not add to the functionality or improve the economics of a system. The Solarcon 800 and 1600 both were designed for the Solidyne Micromizer microprocessor but the En-Log 3000 microprocessor, which En-Log Corporation manufactured, was substituted as an equivalent. In the transactions at issue in these cases, AES purportedly purchased the systems from Sol Tech. The stated purchase price was $ 50,000 for the Solarcon 800 and $ 80,000 for the Solarcon 1600. AES paid for the Solarcon 800 and 1600 with cash down payments of $ 2,600 and $ 3,500, respectively, and financed the remainder of the purchase price with promissory notes in the amounts of $ 47,400 and $ 76,500, respectively. At the time of purchase, the fair market value of the Solarcon 800 was $ 2,036 and the fair market value of the Solarcon *314 1600 was $ 2,735. [2] The off-the-shelf price of the En-Log microprocessor was $ 994 at that time. AES leased the systems, either a whole system or an undivided interest in a system, to investors for a 12-year term. The lessee of a whole unit paid an advanced guaranteed first year cash rental of $ 6,000 for the Solarcon 800 and $ 8,500 for the Solarcon 1600. Pacheco leased 20 percent of a Solarcon 1600 and paid $ 1,700 as advanced guaranteed rental (20 percent of the $ 8,500 advanced guaranteed rental for a whole unit). Bornhagen leased 60 percent of a Solarcon 800 and paid $ 3,600 in cash, a like proportion of the advanced guaranteed rental for a whole unit. Pursuant to the lease agreements, AES elected to pass the investment tax credit and the energy tax credit from lessor (AES) to lessees (petitioners). Lessees agreed to use their best efforts to place their system with *315 an end user capable of realizing energy savings. Petitioners agreed to select a service company that would find a suitable end user and install the system. Pacheco and Bornhagen each signed an installation and service agreement with United States Energy Management Systems, Inc. ("U.S. Energy"). U.S. Energy agreed to install the systems with an end user in return for $ 2,500 for a Solarcon 800 and $ 3,500 for a Solarcon 1600. The end user would pay U.S. Energy 50 percent of its energy savings. U.S. Energy would retain 15 percent of the amounts received from the end users as payment from lessees for an ongoing service contract and pay the remainder to petitioners as sublessors. The sublessors, in turn, would pay 80 percent of the amount received from the service company, net of expenses, to AES as rental on their leases. AES then would pay Sol Tech 80 percent of the rentals as payments on the purchase notes. AES could cancel the lease if its rental receipts for the first eight years were not at least $ 10,000, or, if after the first five years, its rental receipts were zero for the following 18 months. Donald Fleming was the owner and sole shareholder of U.S. Energy. He established *316 U.S. Energy to install energy management systems after Sol Tech contacted him in early 1984, even though he had no real experience in the energy management business. Fleming understood that Sol Tech would send him complete systems ready for installation but it never did. He received microprocessors directly from En-Log and some solar panels from Sol Tech. U.S. Energy purchased the necessary batteries, relays and wiring to install the systems. AES would send U.S. Energy a name of an investor and a serial number representing a particular system. Sol Tech and En-Log each sent their own serial numbers corresponding to the same systems. Four to six people, each assigned different serial numbers by AES, Sol Tech and En-Log with respect to the same equipment, might own the same system. U.S. Energy installed some systems through subcontractors. The end users of the systems U.S. Energy installed had problems with their systems because of the solar "flaps" appended to the energy management system. In one case, the battery that stored the solar energy exploded, causing the air-conditioning in the building to shut down. In other cases, end users asked U.S. Energy to remove the systems *317 because they were turning their heating units and their air-conditioning units on and off at the wrong times. Petitioners invested in AES after receiving a promotional package from their financial planner, Balanced Financial. The package included a tax opinion which outlined the possible tax problems with the program. The tax opinion commented on, among other topics, trade or business and profit motive requirements, effects of overvaluing the equipment, and abusive tax shelters, in relation to the AES program. The tax opinion also stated that the president of AES was a named respondent in a proceeding in which the New York State Attorney General alleged collusion to overinflate the value of energy control systems in conjunction with a different transaction, falsely leading investors to expect significant tax credits based on the overvaluation of equipment. In addition, the tax opinion stated that Jose Chavez, whose appraisal AES used in the promotional materials, was also a named respondent in the New York investigation. The opinion indicated that the New York Attorney General alleged that Chavez' "income approach" to determine fair market value, similar to the method he used *318 in the AES promotional materials but in a different energy leasing transaction, was mere speculation. The promotional materials provided the following analysis of the tax benefits of the leasing program: AMERICAN ENERGY SYSTEMS LEASING, INC.
SOLARCON SERIES
1984 EQUIPMENT LEASING PROGRAM
First Year Tax Writeoffs and Cash Benefits
Assuming 50% Bracket Taxpayer
COST BASIS
50,000 80,000 Advanced guaranteed rental
payment
$ 6,000
$  8,500
Estimated Service fee
2,500
3,500
Total
$ 8,500
$ 12,000
TAX BENEFITS
Investment Tax Credit
$ 5,000 $ 8,000 Energy Tax Credit
$ 7,500 $ 12,000 Tax Cost (50%) on Annual
Inclusion of income equal to
50% of Allowable Credit
(625)
(1,000)
Tax Savings (50%) on total
advanced guaranteed rental
payment and service fee
4,250 6,000 Total Tax Benefits in year of
acquisition
$ 16,125
$ 25,000
Positive Cash Benefit
$  7,625
$ 13,000
Taxpayer elects under Sec. 48 (q)(1) to maintain the Investment Tax Credit at ten percent (10%), the Energy Tax Credit at fifteen percent (15%) *319 and to include in income ratably over five years an amount equal to fifty percent (50%) of the allowable credits. Alternate Method of Computation Available. The above schedules were prepared by the Lessor and do not include any revenues from the Solarcon Series systems. Each Lessee is advised to consult with his own tax advisor. The AES promotional materials included an "appraisal" of the Solarcon systems by Jose Chavez. Chavez' report stated that the equipment he evaluated included a Solidyne Micromizer Energy Controller, not the En-Log actually used. The En-Log, however, was an acceptable substitute. The report listed "gross income to lessee" for a 15-year period and stated that $ 50,000 and $ 80,000 were fair market values for the systems. The only income flow information this report provided was "gross income to lessee," without reduction for the 15 percent service fee or the 50 percent lease payment. The "income" was totalled for 12 years but was not discounted to present value. The report was misleading and did not realistically predict cash flow to lessees or present a discounted present value of the predicted income stream to lessees. The promotional materials also *320 contained a report by independent accountants. This report included an after-tax cash flow analysis. The accounting firm stated, however, that it used the values that AES provided it and did not express any opinion of the fair market value of the systems. Pacheco did not read the materials before investing. An employee of Balanced Financial told Pacheco he would make a profit with the AES investment, and Pacheco did not seek or obtain advice from any other source. Pacheco understood the effect of the promised tax credits. Pacheco did not know who, if anyone, leased the other 80 percent of his system. He also did not attempt to follow the progress of the system after he entered into the transaction. The Pachecos claimed a $ 8,999 operating loss for 1984 from their leasing transaction with AES. The loss included $ 3,281 in depreciation expense for solar components, despite the Pachecos' status as lessees of the equipment from AES and not as owners. The Pachecos' 1984 tax return lists two assets as "solar equipment," one with a $ 16,000 basis and one with a $ 25,000 basis. The $ 16,000 basis corresponds to the Pachecos' 20 percent interest in a Solarcon 1600. Pacheco did *321 not know what the second asset was or why it was on the return. The Pachecos as lessees claimed tax credits based on a purported fair market value for their interest in the equipment of $ 41,000 as follows: $ 4,100 investment tax credit and $ 6,150 energy tax credit. The Pachecos used $ 5,929 of the claimed $ 10,250 credits in 1984. Pacheco permitted an individual, whom he had never met and never spoken to, to prepare his 1984 return. Yet, Pacheco did not review his return prior to signing it; he only looked at the amount of the refund he was due. The Pachecos received a pre-filing notification letter from the IRS prior to filing their 1984 return which stated that the IRS had reason to challenge their return if they took any deductions or credits based on the AES investment. Balanced Financial also introduced the AES program to petitioners Paul and Cindy Bornhagen. Bornhagen was interested in solar energy as an alternative energy source. He read the AES promotional package before investing. Bornhagen relied on Balanced Financial and the AES materials, and did not seek or obtain advice from any other source. After investing in AES, Bornhagen attempted to follow the progress *322 of the system by contacting Balanced Financial and the end user identified by AES. The Bornhagens did not know who, if anyone, leased the other portion of their system. The Bornhagens claimed a $ 5,675 loss for 1984 as a result of their AES investment. They claimed a $ 3,000 investment tax credit and a $ 7,500 energy tax credit based on the purported $ 30,000 fair market value for their share of the Solarcon 800 equipment. The Bornhagens were only able to use $ 4,684 of the $ 10,500 credits for 1984; they claimed a refund of all the tax they paid for 1984 and attempted to carry back the unused credits to their 1981 and 1982 taxable years. The Bornhagens received a pre-filing notification letter from the IRS with regard to the AES program after they filed their 1984 tax return but before filing their application to carry back the unused credits. OPINION The primary issue we must decide is whether petitioners are entitled to deductions and credits related to their lease interests in energy management systems. Respondent argues that petitioners were not engaged in a trade or business or an activity for the production of income with an intent to make a profit and thus are not *323 entitled to any deductions or credits. In their three-page post-trial brief, petitioners stated in a conclusory fashion that they had a profit motive. A transaction will not be disregarded simply because it is motivated by considerations of reducing tax. Frank Lyon Co. v. United States,435 U.S. 561, 581 (1978); Gregory v. Helvering,293 U.S. 465 (1935). A transaction entered into solely to obtain tax benefits, however, with no other business purpose and with no economic substance because no reasonable possibility of a profit exists is a sham and is ignored for Federal income tax purposes. Frank Lyon Co. v. United States, supra at 583-584; James v. Commissioner,87 T.C. 905, 918 (1986); Estate of Thomas v. Commissioner,84 T.C. 412, 433 (1985). In deciding whether a transaction is devoid of economic substance, the taxpayer's subjective statement as to his profit motive in entering into a transaction is relevant, *324 but we place greater emphasis on objective facts demonstrating a realistic potential for profit. Cherin v. Commissioner,89 T.C. 986, 992 (1987). A realistic potential for profit exists "when the transaction is carefully conceived and planned in accordance with standards applicable to the particular industry, so that judged by those standards the hypothetical reasonable businessman would make the investment." Cherin v. Commissioner, supra at 994. Petitioners each leased an undivided interest in an energy management system owned by AES. Pacheco leased 20 percent of a Solarcon 1600, and Bornhagen leased 60 percent of a Solarcon 800. AES and Sol Tech grossly inflated the purchase price of the systems when Sol Tech sold the systems to AES. All of the components of the Solarcon 800 and 1600 were readily available on the market. Whereas AES "paid" Sol Tech $ 50,000 and $ 80,000 for the Solarcon 800 and 1600, respectively, the prevailing market prices were $ 2,036 and $ 2,735. Although Sol Tech was ostensibly the "manufacturer" of the systems, it actually purchased component parts at the prevailing market price and then inflated the price from under *325 $ 3,000 to $ 50,000 and $ 80,000 when it "sold" the same components to AES. AES and Sol Tech thus greatly overstated the fair market value of the equipment that it leased to investors by manipulating their sale. The investment tax credit and the energy tax credit, passed through to petitioners as lessees at the election of AES, section 48(d), were calculated on grossly inflated values. In addition, the leasing program itself was disoriented. Sol Tech never sent a complete system ready to install to the installer that petitioners selected, U.S. Energy. Neither Sol Tech nor AES made any effort to assemble the systems. U.S. Energy received the microprocessors directly from En-Log, the manufacturer, and some of the solar components from Sol Tech. It purchased the necessary batteries, wiring and relays itself. U.S. Energy had difficulty identifying a system as belonging to a particular investor because it received different serial numbers for each investor from AES, Sol Tech and En-Log. Even when U.S. Energy did have all of the component parts of a system to install, the installation effort was disjointed. U.S. Energy made a bona fide attempt to install the systems, but the end *326 users had problems because of the solar "flaps." The solar components interfered with and inhibited the proper operation of the energy management systems. The solar panels barely provided enough energy to power the completely redundant set of relays. The solar-powered relays, appended to a system between the necessary relays in the microprocessor and the controlled equipment, only added another layer of potential for system failure. AES, with the help of Sol Tech, was attempting to manufacture and sell tax benefits in the guise of solar powered energy management systems. The value of the systems leased by petitioner was inflated 25 times. The overstated market value of the systems, however, does not by itself determine the economic feasibility of the AES program. See Soriano v. Commissioner,90 T.C. 44, 54 (1988). A cash flow analysis will, however, demonstrate the potential profitability of the investment to the lessees by measuring the present value of income reasonably projected from the leases. Soriano v. Commissioner, supra at 54. In these transactions, *327 any economic profit to a lessee would result from an end user's energy savings. The profit from energy savings is necessarily based on a number of assumptions: (1) the energy bill of the end user of the systems at issue; (2) the growth rate of energy costs over time; (3) a discount rate determined with regard to the risk involved in investing in the systems; (4) the energy savings a typical end user would realize; and (5) the systems' useful life. We believe the assumptions that respondent's expert witness, Stanley S. Kolodkin, used are appropriate. Kolodkin was knowledgeable and experienced in the manufacture and lease of energy management systems. Kolodkin used trade publications, industry studies, and his experience to make each assumption. Petitioners did not rebut these assumptions or impugn Kolodkin's expertise. Petitioners offered no expert testimony. An appraisal prepared by petitioners' witness, Jose Chavez, appeared in the AES promotional materials. At trial, we did not admit the appraisal as an expert report because, inter alia, Chavez testified that (1) he did not intend to determine the fair market value of the systems in the report, and (2) he merely used assumptions *328 provided by AES, i.e., he did the arithmetic to calculate an undiscounted income flow. Kolodkin's assumptions, which we accept as appropriate, are as follows: Energy cost growth
8.18%
Discount rate
20%
End user energy savings
10%
Useful life of systems
15 years
Kolodkin also used the promoter's assumptions for the typical energy bill of end user as follows: Solarcon 1600
$ 55,000
Solarcon 800
35,000
Kolodkin's analysis properly disregards any tax consequences to the investors. See Herrick v. Commissioner,85 T.C. 237 (1985). The discounted cash flow also takes into account petitioners' initial cash outlay (the guaranteed advance rentals and installation expenses). Using these assumptions, Kolodkin calculated [3] that the net present value of the income stream from the lease of a Solarcon 1600 was negative $ 7,626 and the net present value of the income stream from the lease of a Solarcon 800 was negative $ 5,717. Petitioners' 20 percent and 60 percent interests translate into negative $ 1,525 and negative $ 3,430 net present *329 values. A net present value below zero indicates that no economic return could be realized on the investment. The information necessary to analyze the economic potential of petitioners' investments was available and accessible prior to the time petitioners entered their transactions. Petitioners, therefore, should have anticipated no reasonable possibility of making a profit. The negative net present values are similar to the grossly inflated purchase price that we have held indicative of indifference toward economic profit. See Soriano v. Commissioner, supra at 57, and cases cited therein. Petitioners invested in their interests an amount equal to the advance rentals plus *330 the installation charge. Pacheco, therefore, "paid" $ 2,400 for an interest with a negative return of $ 1,525 and Bornhagen "paid" $ 4,100 for an interest with a negative return of $ 3,430. A reasonable investor would not have "paid" to, in effect, lose money. In addition, the first year rentals for the Solarcon 800, $ 6,000, and for the Solarcon 1600, $ 8,500, were about three times greater than the prevailing discount market purchase prices of the same systems, viz, $ 2,036 and $ 2,735. Even on a retail market, the Solarcon 800 would have cost $ 3,441 and the Solarcon 1600 would have cost $ 4,618. The first-year rental payments, therefore, were almost twice the amount for which the same systems could have been purchased outright. Petitioners did not independently investigate the actual value of the equipment they leased or the potential for economic gain. Petitioners had no experience in energy management or leasing equipment and relied only on Balanced Financial's advice. The failure to investigate the economic feasibility of the AES program indicates a lack of business purpose. *331 Beck v. Commissioner,85 T.C. 557, 577 (1985); Elliott v. Commissioner,84 T.C. 227, 239 (1985), affd. without published opinion 782 F.2d 1027 (3d Cir. 1986). Petitioners testified in a conclusory fashion that they had a profit motive when they invested in AES. Pacheco, however, admitted that he had not even read the promotional materials. Although Bornhagen read the materials, the tax opinion should have alerted him to the many potential tax problems with the AES investment including the profit motive requirement and consequences of overvaluation. Also, the materials stated that the president of AES was then under investigation in New York for falsely leading investors to expect significant tax credits in similar transactions. We believe that a reasonable and prudent business decision could not have been made on the basis of the offering materials or the advice of Balanced Financial. In fact, the offering materials would have prompted a reasonable investor to independently investigate the leasing program. We conclude that no realistic potential for profit existed in leasing the systems and that petitioners could not have been *332 motivated by any business purpose. The principal purpose of this arrangement was the avoidance of Federal income tax. The transactions, therefore, will be ignored for Federal income tax purposes. As a result, respondent's determination that all deductions and credits related to the AES leasing program should be disallowed will be sustained. Respondent determined additions to tax for the taxable year 1984 pursuant to section 6653(a)(1) and section 6653(a)(2). Petitioners have the burden of proof with regard to each of these additions to tax. Rule 142(a). Section 6653(a)(1), as in effect for 1984, provided for an addition to tax equal to five percent of an underpayment if any part of the underpayment was due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) imposed a further addition to tax equal to 50 percent of the interest payable on that portion of the underpayment of the tax attributable to negligence or intentional disregard of rules or regulations. *333 For purposes of section 6653(a), negligence is defined as lack of due care or failure to do what a reasonable and prudent person would do under the circumstances. Neely v. Commissioner,85 T.C. 934, 947 (1985). Petitioners argue in one paragraph of their three-page brief, citing no authority, that they relied in good faith on their financial advisers and the AES promotional materials and that they attempted to get the systems installed. Pacheco did not bother to read the promotional materials and, therefore, could not have relied on them. Bornhagen read the materials, but the promotional materials would have alerted a reasonable investor that the only "profit" to be realized was the tax benefits. Had the systems functioned as represented, and they did not, petitioners would not have made an economic profit. Petitioners leased partial interests in energy management systems without fully investigating the potential for earning a profit. A reasonable person motivated by concerns *334 other than tax avoidance would have performed such an investigation. See Beck v. Commissioner, supra;Elliott v. Commissioner, supra.We hold that petitioners are liable for additions to tax for negligence. The underpayments resulting from the deductions and credits petitioners took with respect to the AES leasing program were attributable to negligence. This record contains other indicia of negligence. The IRS informed the Pachecos that the IRS would challenge any deductions or credits based on the AES leasing program prior to the time they filed their return. Yet the Pachecos persisted, without independent advice, in claiming the tax benefits of this sham transaction. The Bornhagens likewise received fair warning from respondent prior to filing their application to carry back the unused investment credits to 1981 and 1982. Like the Pachecos, the Bornhagens ignored the warning. The additions to tax for negligence are appropriate in these cases. Respondent also determined additions to tax pursuant to section 6659. Section 6659 provides for an addition *335 to tax if an underpayment of tax is attributable to a valuation overstatement. A valuation overstatement exists if the value of property, or the adjusted basis of property, claimed on a return is 150 percent or more of the correct value. Sec. 6659(c). Section 6659 provides for an addition to tax equal to 30 percent of an underpayment attributable to an overvaluation of more than 250 percent. The underpayment attributable to the valuation overstatement must be at least $ 1,000. Sec. 6659(d). We found that the fair market value, on which the investment credits are calculated for a lessee of a pass-through election, of the Solarcon 800 was $ 2,036 and of the Solarcon 1600 was $ 2,735. Fifty thousand dollars and $ 80,000, the values petitioners used to claim the investment and energy tax credit on their returns, substantially exceed 250 percent of $ 2,036 or of $ 2,735. Deduction of rental, installation and related expenses, however, was not dependent on a determination of basis or fair market value. Disallowance of these expenses, therefore, will not support a section 6659 addition to tax. Soriano v. Commissioner,90 T.C. 44, 61-62 (1988); cf. Zirker v. Commissioner,87 T.C. 970 (1986). *336 Although petitioners conceded on brief that they are not entitled to the investment tax credit or energy tax credit because their systems were not installed in 1984, we refuse to accept their concession. The evidence in the record shows that the AES leasing program was a sham and lacked economic substance. This is a test case for other AES investors and should be decided on the evidence in the record. In particular, petitioners should not be able to avoid the additions to tax for overvaluation by conceding the issue in a four-page post-trial reply brief. Compare McCrary v. Commissioner, 92 T.C.    (April 17, 1989). The underpayments attributable to the valuation overstatements in these cases were greater than $ 1,000. Petitioners overvalued the systems by at least 2,400 percent. We hold that the section 6659 addition is 30 percent of the underpayment of tax attributable to the investment tax credit, energy tax credit, and depreciation deduction (if any) taken with respect to the AES leasing program. We next consider whether petitioners are liable for the *337 additional interest imposed on underpayments attributable to tax motivated transactions pursuant to section 6621(c), formerly section 6621(d). Section 6621(c) provides for an increase in interest to 120 percent for underpayments exceeding $ 1,000 attributable to tax motivated transactions. The term "tax motivated transaction" includes any section 6659(c) overvaluation, sec. 6621(c)(3)(A)(i), and "any sham or fraudulent transaction," sec. 6621(c)(3)(A)(v). Transactions devoid of economic substance are sham transactions for purposes of section 6621(c)(3)(A)(v). Friendship Dairies, Inc. v. Commissioner,90 T.C. 1054, 1068 (1988); Cherin v. Commissioner,89 T.C. 986, 1000 (1987). The evidence is unequivocal in showing that the AES leasing program had no economic substance and was a sham. Also, the underpayments attributable to the AES leasing program exceeded $ 1,000. The increased interest rate, therefore, applies to the underpayment attributable to all credits and deductions taken with respect to the *338 AES leasing program, and not just the portions attributable to the valuation overstatement. Sec. 6621(c)(3)(A)(v). See Johnson v. Commissioner,85 T.C. 469, 483 (1985). Decisions will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954 as in effect for the years in issue unless otherwise indicated. * 50% of interest due on $ 8,707. ** 50% of interest due on $ 6,267.↩
2. These values represent the fair market value to a bulk purchaser such as Sol Tech or AES and reflect a 40 percent trade discount, typical in the industry. The fair market value (i.e., retail price) to someone purchasing one system was $ 3,441 for the Solarcon 800 and $ 4,618 for the Solarcon 1600.↩
3. After making the assumptions, the calculations are a matter of arithmetic. See Soriano v. Commissioner,90 T.C. 44, 55-56↩ n.15 (1988) (methodology for determining the net present value).