GORDON TANNER and JOAN TANNER, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Tanner v. Commissioner
Docket Nos. 213-86, 22654-86, 22228-89
United States Tax Court
T.C. Memo 1992-235; 1992 Tax Ct. Memo LEXIS 247; 63 T.C.M. (CCH) 2819; April 21, 1992, Filed *247 Orders will be issued restoring these cases to the general docket for disposition of remaining issues. Curtis U. Darling and Suellen H. Anderson, for petitioners in docket Nos. 213-86 and 22228-89. Jack Elon Hildreth, Jr., for petitioners in docket No. 22654-86. Steven J. Sibley, for respondent. DAWSON
DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: These consolidated cases were assigned to Special Trial Judge John J. Pajak pursuant to the provisions of section 7443A(b)(4) and Rules 180, 181, and 183. All section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. The Court agrees with and adopts the Special Trial Judge's opinion, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE PAJAK, Special Trial Judge: In these consolidated cases, [2] respondent determined deficiencies in and additions to petitioners' Federal income taxes as follows: Petitioners Gordon Tanner and Joan Tanner - Docket No. 213-86
Year
Deficiency
Addition to Tax
Sec. 6651(a)(1)
1980
$ 12,494
$ 2,438
1982
14,479
--  Petitioners Gordon Tanner and Joan Tanner - Docket No. 22228-89
Additions to Tax
Year
Deficiency
Sec. 6653(a)(1)(A)
Sec.6653(a)(1)(B)
1986
$ 7,458
$ 373
[1]
*248 For 1986, respondent also determined that petitioners are liable for increased interest under section 6621(c) (formerly 6621(d)). Petitioners James B. Hodges and Dorothy B. Hodges - Docket No. 22654-86
Additions to Tax
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)
6653(a)(1)
6653(a)(2)
6661
1979
$ 22,098
$ 1,105
--  --
--
1982
30,039
-- $ 1,502
[1]
$ 2,620
For 1979 and 1982, respondent also determined that petitioners are liable for increased interest under section 6621(c) (formerly 6621(d)). *249 In her second amendment to answer in docket No. 213-86, respondent raised the increased rate of interest under section 6621(c) and further additions to tax. Respondent subsequently conceded some of these additions. Remaining for decision after trial are the increased rate of interest under section 6621(c) for 1980 and 1982, the addition to tax under section 6653(a) for 1980, the additions to tax under section 6653(a)(1) and (2) for 1982, and the additions to tax under section 6661 for 1982. After concessions, [3] the Court must decide: (1) Whether petitioners' nonrecourse notes are bona fide debt and therefore includable in basis for purposes of claiming depreciation deductions; (2) whether interest expense deductions are allowable with respect to petitioners' nonrecourse notes; (3) whether petitioners' losses should be limited to their amount "at risk" within the meaning of section 465; (4) whether petitioners' nonrecourse notes are includable in basis for purposes of computing the credits allowable under section 46(c)(8)(F); (5) whether petitioners Tanner are liable for the addition to tax under section 6651(a)(1) for failure to timely file their return for taxable year 1980; *250 (6) whether petitioners are liable for the additions to tax for negligence under section 6653(a); (7) whether petitioners are liable for the additions to tax for substantial understatements under section 6661 for taxable year 1982; and (8) whether petitioners are liable for the increased rate of interest under section 6621(c) for all years in issue. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Petitioners Tanner resided in Bakersfield, California, when their petitions were filed. Petitioners Hodges resided in San Clemente, California, when their petition was filed. Mr. Gordon Tanner is a Certified Public Accountant in the State of California, who has practiced since 1965. He previously had worked *251 as an accountant for an oil company. Mr. Tanner has many clients in energy-related companies. He has investment experience in real estate and oil properties. Mr. James B. Hodges is a real estate broker, property developer, and investor. He has a marine engineering license from the California Maritime Academy and a business degree from the University of Southern California. In 1982, Mr. Tanner and Mr. Hodges separately invested in wind turbine generators (wind turbine) sold by Oak Creek Energy Systems, Inc. (Oak Creek). Oak Creek was part of the Oak Creek Energy Group. Oak Creek offered and sold investments in wind turbines located on the wind farm. Dean Beckett was president, Dale Soule, Jr. was vice president, and Steve Cummings was treasurer of Oak Creek. The Oak Creek Energy Group was comprised of a partnership that owned the wind farm land, and four California corporations formed by the partners for purposes of a wind farm business. The four corporations were Oak Creek, Wind Maintenance, Inc., Wind Installation, Inc., and Willow Springs Wind Farm, Inc. Dean Beckett, Steve Cummings, and others were partners in the partnership. Wind Installation, Inc., installed wind *252 turbines purchased by investors. Wind Maintenance, Inc., performed maintenance on wind turbines. The sole purpose of Willow Springs Wind Farm, Inc., was to sell a type of turbine which is not in issue in this case. These three corporations were merged into Oak Creek on October 1, 1983. The wind farm was located southeast of Bakersfield, California, in the Tehachapi Mountains. This area is one of several areas in the State that the California Energy Commission in reports dated March and April 1981, after a number of government-funded surveys, designated as having excellent wind resource potential. Prior to the sale of any wind turbines to petitioners in this case, Beckett/Cummings commissioned a detailed, half-year study of the wind farm (AeroVironment report). AeroVironment, Inc. (AeroVironment), the company that conducted the study, estimated that the average annual wind speed on the wind farm ranged from 12 to 15 miles per hour. The average annual wind speed in the better areas was about 14.5 miles per hour. AeroVironment used both stationary pole-mounted and moveable kite-mounted anemometers to evaluate the wind flow patterns at different parts of the wind farm. Based *253 upon this study, areas were selected for installation of wind turbines in arrays. Wind Turbine Cost and Type
The final cost to Oak Creek of any wind turbine is comprised of a number of elements. The first is the initial cost of the turbine itself, including blades and generators. These must be shipped from the place of manufacture or port of entry. A wind turbine must be mounted on a pole or tower (tower). The tower stands on a concrete foundation which requires excavation and grading. The tower and turbine must be raised and installed on the foundation, and the erected wind turbine must be connected to a meter, other electrical equipment, and the utility transmission lines (power grid). Two types of wind turbines that Oak Creek sold to investors are relevant to the present case: the Jay Carter JCE-25 model (Carter wind turbine), and the Vestas 65 kW model (Vestas wind turbine). The Carter wind turbine is an American turbine made in Texas. It has two blades, each about 16 feet long, and a nameplate rating of 25 kilowatts (kW). Its cost was $ 29,000. The cost of shipping a Carter wind turbine from Texas to Oak Creek was $ 3,000. The 80-foot high tower cost $ 1,200. *254 The installation cost was $ 5,000. These and other direct expenses totaled approximately $ 39,000. The Vestas wind turbine is a Danish turbine. It has three blades which are each about 24 feet long, and a nameplate rating of 65 kW. Its cost was $ 52,000 c.i.f. Los Angeles. Customs duty and processing fees were about $ 4,000. The cost of shipping a Vestas wind turbine from Los Angeles to Oak Creek was about $ 400. The foundation cost about $ 15,500. An installation charge by the manufacturer was $ 1,500. These and other direct expenses of obtaining and installing a Vestas wind turbine at Oak Creek totaled approximately $ 80,000. The nameplate rating is the amount of electricity the wind turbine can produce per hour in wind of a certain speed used by the manufacturer to rate the turbine's performance. It is not necessarily the maximum output, nor are the ratings necessarily comparable, because various manufacturers rate their wind turbines at different wind speeds. More indicative of a wind turbine's performance is its "power curve," a graph describing the wind turbine's output over a range of wind speeds. The wind turbines involved in this case were located in the areas *255 of the farm with the higher wind speeds. AeroVironment's projected annual output of the Carter wind turbines in these areas was 59,100 to 67,000 kilowatt hours (kWh). Oak Creek's projected annual output of the Vestas wind turbine was 180,000 kWh. Power Agreement
The income a wind turbine produces is dependent upon the electrical output of the turbine and the price at which the electricity is sold. Oak Creek sold the electricity generated by the wind turbines on its wind farm to Southern California Edison (SCE), a utility company. Normally, a utility company would use its least expensive source or most efficient means of generating electricity before it used any other means. The Public Utility Regulatory Policies Act of 1978 (PURPA), Pub. L. 95-617, sec. 210, 92 Stat. 3144, [4] requires utilities to purchase power from small producers, like Oak Creek, at no more than the utility's "avoided cost." The avoided cost is the cost which a utility company would incur to generate the equivalent power, as well as an avoided cost component, representing some recognition of the capital costs, or facility costs, of the power plants. *256 On March 3, 1982, Oak Creek entered into a Wind Park Power Purchase and Sales Agreement (power agreement) with SCE for the sale of electricity to the utility. The power agreement provided that SCE would pay Oak Creek for power delivered to SCE according to a graduated schedule, with fixed prices increased approximately 15 percent between 1983 and 1985, and thereafter as a fraction of the then-determined avoided cost as filed with the California Public Utilities Commission. The following price schedule was to be in effect if the Oak Creek farm had a 5,000 kW nameplate rating: Price per kWh
Through 1983
1984
1985
1986-1989
1990-2002
8 cents
9 cents
10 cents
85% of
75% of
avoided cost
avoided cost
If Oak Creek expanded to a 20,000 kW nameplate rating, the price schedule was as follows: Price per kWh
Through 1983
1984
1985
1986-1989
1990-2002
8 cents
9 cents
10 cents
90% of
75% of
avoided cost
avoided cost
Oak Creek paid an investor these stated prices for kWhs attributed to a wind turbine at its meter at the base of its tower. Oak Creek absorbed any loss differential in transmission between the wind turbine *257 and SCE's power substation. Investment Prospectuses
The investment prospectus for each wind turbine generally described Oak Creek and its principals, and presented pictures of equipment and installation work being done. The prospectuses also provided background information on wind power as a new alternate energy source and described Federal and State incentives, including tax credits, designed to induce industry growth. Oak Creek's Carter prospectus offered to finance $ 25,000 of the $ 84,800 purchase price through Oak Creek with the "Finance payment paid from power produced." Specifically, two financing projections were presented in the Carter prospectus: One where the investor financed the entire purchase price, $ 25,000 through Oak Creek and $ 59,800 through an outside lender; and another where the investor paid $ 59,800 of the purchase price with cash and financed $ 25,000 through Oak Creek. The Vestas prospectus showed a financing projection whereby an investor made a $ 19,240 cash downpayment, and the investor financed $ 48,580 through Oak Creek and $ 70,000 through an outside bank. The Vestas prospectus did not contain the statement that the Oak Creek financing *258 was paid from power produced. Oak Creek provided "performance insurance", a guarantee of up to 100 percent of generated revenue if the wind turbine malfunctioned or was damaged and did not operate for a prolonged period, as well as the manufacturer's warranty, as features of the investment. Nothing in the trial record explained the exact terms of the guarantee or warranty, nor was a separate fee charged for these items. In the 1982 prospectus for the Carter wind turbines (Carter prospectus), the stated price was $ 84,800. Oak Creek assumed an annual output of 76,000 kWh and wind speeds of 15 to 17 miles per hour, which were above the estimates in the AeroVironment report. The following is an excerpt from the financial projections chart of the Carter prospectus, which contained projections through the year 2001: OAK CREEK ENERGY SYSTEMS, INC. FINANCIAL PROJECTIONS STATEMENT OF OPERATIONS AND CASH FLOW 1982
1983
1984
1985
1986
1987
Price of Power (per kilowatt)
$  .080
.080
.090
.100
.126
.145
Power Produced (kilowatts)
38,000
76,000
76,000
76,000
76,000
76,000
TOTAL REVENUE
$ 3,040
6,080
6,840
7,600
9,576
11,020
* * * According to the *259 prospectus for the Vestas wind turbine (Vestas prospectus), performance insurance was also part of this wind turbine investment. Oak Creek projected operations and cash flow starting in 1983, based upon wind speeds of 16 miles per hour. The Vestas prospectus used the same assumptions as the Carter prospectus but mistakenly postponed the price increases and percentage expenses by one year for each year after 1983, as shown on this excerpt from the prospectus: OAK CREEK ENERGY SYSTEMS, INC. PURCHASE OF WIND TURBINE ($ 137,800 INCLUDING SALES TAX) FINANCIAL PROJECTIONS STATEMENT OF OPERATIONS AND CASH FLOW 1983
1984
1985
1986
1987
Price of Power (per kilowatt)
$    .080
.080
.090
.100
.126
Power Produced (kilowatts)
180,000
180,000
180,000
180,000
180,000
TOTAL REVENUE
$  14,400
14,400
16,200
18,000
22,680
* * * The financial projections for each type of wind turbine included other expenses so that profit or loss was shown. The following table shows how expenses of each wind turbine were determined: Carter Wind Turbine
Vestas Wind Turbine
Maintenance
10% or less of gross
10% of gross revenue
revenue
Management *
2 1/2% of gross revenue
4% for 5 years, then
10% of gross revenue
Accounting
part of management fee
2% of gross revenue
Tax & Insurance
estimated $ 650 per year
estimated $ 1,400 per
year
Land Lease
7 1/2% of gross revenue
10% of gross revenue
Interest
depended upon loans
depended upon loans
*260 These expenses were given in their projected numerical values. The expenses, which were based on a percentage of gross revenue for the Vestas wind turbine, were misstated in the same manner that the stated power price on the Vestas prospectus differed by 1 year from the power agreement and the Carter prospectus. The Vestas prospectus was not free from other minor errors. A comparison of the two prospectuses and their underlying assumptions revealed that these Vestas' expense figures were transposed en masse by 1 year, resulting in computational errors in the parts of the chart dependent upon prior years' figures. Oak Creek incorporated assumed tax benefits in its financial projections of profitability, which were computed by an accounting firm based upon many assumptions. The projections showed before-tax cash profits beginning at various times between the first and sixth years of operation, depending upon the financing option chosen by an investor. These projected profits increased to substantial *261 amounts as years passed. Oak Creek disclaimed any responsibility as to the accuracy or reliability of the assumptions, and advised prospective investors to consult with professional advisors as to any investment. Investment Sales Contract
The Wind Turbine Sales and Management Agreement with addenda (sales contract) for each wind turbine provided that Oak Creek would install, connect, manage, and maintain the wind turbine. The sales contract required the purchaser/investor to lease the site from Oak Creek for 20 years. Oak Creek agreed to indemnify and hold the investor harmless from any claims resulting from the lease of the site or performance of the services even though the investor was required to maintain public liability insurance coverage. The investor agreed to pay Oak Creek for management and maintenance services, and the other expenses set out above. (The various divisions of Oak Creek or its related corporations performed the services called for under the contract.) Oak Creek agreed to operate and repair the wind turbines, collect revenues, apply them to expenses, remit any balance to the investor, and provide a quarterly accounting to the investor. The final *262 price of a wind turbine investment included the direct acquisition and installation costs described above, administrative and overhead expenses, and Oak Creek's profit. Investments
During 1982, Mr. Tanner received prospectuses for various wind turbine investments, including those from Oak Creek. Mr. Tanner verified the existence and rates of the power agreement, as well as the existence of a connection to the power grid of SCE. Mr. Tanner understood the effect of oil prices on the price of electricity. He consulted with Lytton Ivanhoe, a petroleum exploration consultant, on future energy prices. Oil prices had increased steadily until 1982. Mr. Tanner believed such increases would continue. Mr. Tanner contacted the California Energy Commission (CEC). He received information concerning the State's promotion of wind energy and other information to compare with Oak Creek's prospectus. This included CEC documents such as "Wind Energy Assessment of California," a March 1981 staff report; "Wind Energy - Investing in Our Energy Future," an April 1981 report, which included a discussion of Federal and State tax incentives; and "Wind Energy Program Progress Report," a January *263 1982 report. Mr. Tanner also obtained a copy of the AeroVironment report. Mr. Tanner researched provisions of the Internal Revenue Code which related to his investments. He performed his own investment analyses without the benefit of third-party appraisals. Mr. Tanner, Lytton and Helen Ivanhoe (the Ivanhoes) purchased a Carter wind turbine from Oak Creek on November 20, 1982. The price was $ 80,000 plus $ 4,800 California sales tax. Mr. Tanner owned 25 percent of the Carter wind turbine, and the Ivanhoes owned 75 percent. Their wind turbine was insured against damage and business interruption. Mr. Tanner, Kevin Sluga, and Walter Heisey purchased a Vestas wind turbine from Oak Creek on December 29, 1982. The price was $ 130,000 plus $ 7,800 California sales tax. Mr. Tanner owned 30 percent of the Vestas wind turbine, Mr. Sluga owned 20 percent, and Mr. Heisey owned 50 percent. Thus, Mr. Tanner's share of the sales price of both wind turbines was $ 62,540. The Vestas wind turbine was insured against damage and business interruption. Mr. Tanner also became involved in the sale of wind turbine investments at Oak Creek in 1982. He earned a commission of 10 percent of the *264 price of a wind turbine sold by his referral. After 1982, he engaged in a related activity through Wind Energy Investments, Inc. Mr. Sluga organized this company, and Mr. Tanner was secretary of the company. Mr. Tanner earned substantial amounts promoting wind turbine investments. Mr. Hodges became aware of the Oak Creek wind turbine investment through a friend. He discussed the investment and the sale of electricity with his accountant and performed the investment analysis himself. Mr. Hodges was aware that SCE was required to purchase power from small producers, but he was not sure whether he saw the power agreement. Mr. Hodges relied upon a government report and Oak Creek projections on the wind-related information. During 1982, he visited the farm and observed the assembly and installation of wind turbines. While at the farm, he spoke with a mechanic as well as a representative of the manufacturer of the Carter wind turbine. Mr. Hodges was shown five wind turbines available at the time. He compared the electrical meters to determine which wind turbine had the highest power output. He selected the Carter wind turbine available at the time with the highest output, and *265 purchased it from Oak Creek on or about August 26, 1982. [5] The price was $ 80,000 plus $ 4,800 California sales tax. Financing
Mr. Tanner and the Ivanhoes paid Oak Creek $ 59,800 and executed a nonrecourse $ 25,000 collateral promissory note (Tanner's Carter note), with principal and interest of $ 934.75, payable quarterly for 20 years at 14 percent, to purchase their Carter wind turbine. The $ 59,800 cash payment included $ 50,000 in financing from the San Joaquin Bank and $ 9,800 from a money market account. Mr. Tanner and the Ivanhoes contributed $ 5,000 and $ 15,000, respectively, and opened the money market account to invest in the Carter wind turbine. The Ivanhoes obtained the $ 50,000 loan (Ivanhoe loan) from the San Joaquin Bank. The Ivanhoe loan was for 1 year, renewable annually, *266 and was with recourse. It had principal payments of $ 850 per month, interest at three percent above the bank's prime interest rate, and was secured by the Carter wind turbine. Mr. Tanner and the Ivanhoes executed an agreement to make Mr. Tanner liable for 25 percent of the Ivanhoe loan and to apportion the earnings, expenses, tax benefits, liabilities, and residual value relating to the Carter wind turbine accordingly. The San Joaquin Bank filed a Uniform Commercial Code (UCC) financing statement to protect its security interest. Mr. Tanner and Messrs. Sluga and Heisey paid Oak Creek $ 89,240 and executed a nonrecourse $ 48,560 collateral promissory note to Oak Creek (Tanner's Vestas note), with principal and interest of $ 1,815.17, payable quarterly for 20 years at 14 percent, to purchase their Vestas wind turbine. The $ 89,240 cash payment included $ 19,240 in checks and $ 70,000 in financing from Union Bank. Mr. Tanner obtained the $ 70,000 loan (Tanner loan) from Union Bank to purchase the Vestas wind turbine, with principal payments of $ 1,166.67 per month for 5 years, and interest at three percent above the bank's prime interest rate. The note was with recourse and was *267 secured by the Vestas wind turbine. Mr. Tanner and Mr. Heisey executed a note to make Mr. Heisey liable for an amount equal to 50 percent of the Tanner loan. Union Bank filed a UCC financing statement to protect its security interest. Mr. Hodges initially paid $ 59,800 and executed a nonrecourse $ 25,000 collateral promissory note to Oak Creek (Hodges' Carter note), with principal and interest of $ 934.75, payable quarterly for 20 years at 14 percent, to purchase his Carter wind turbine investment. He financed the $ 59,800 with a recourse loan from the Bank of America (Hodges loan). The Hodges' loan was for a 7-year term, with principal payments of $ 711.90 per month and interest at 2.5 percent above the bank's prime interest rate. Oak Creek never filed a security agreement or a financing statement notifying interested parties of its continuing interest in petitioners' wind turbines which served as collateral for the nonrecourse loans. Wind Turbine Performance and Debt Repayment
Mr. Tanner and the Ivanhoes renewed the Ivanhoe loan at the San Joaquin Bank, and then repaid the balance of the Ivanhoe loan in 1984 with their own funds from the money market account. Mr. *268 Tanner and his coinvestors made payments on the Tanner loan at the Union Bank. Mr. Hodges repaid the Hodges loan from the Bank of America by December 12, 1987. Payments on Mr. Tanner's Carter note, Vestas note, and Mr. Hodges' Carter note were made out of production. According to the relevant prospectus, management agreement, and/or practice of the parties, income from the sale of electricity was collected and applied against wind turbine expenses including interest and principal due on the nonrecourse notes held by Oak Creek. Net cash was distributed to Oak Creek investors. Any negative balances were shown on the quarterly account statement and carried forward into the next quarter to be applied against future production. Petitioners were not required to make direct payments with respect to these deficits to Oak Creek, and such deficits were not recorded as an asset on the books of Oak Creek. An accounting firm, Haws, Theobold, & Auman (the accountants), apparently collected the revenues, paid Oak Creek expenses, and performed the accounting functions. Many of the quarterly statements included the statement that " We are not independent with respect to Oak Creek." We consider *269 the accountants' activity to be that of Oak Creek. Mr. Tanner's Carter wind turbine was placed in service before the end of 1982. Maintenance charges for the first quarter of 1983 were waived because retrofitting was not completed on all machines until January 31, 1983. The four 1983 quarterly statements state that the wind turbine produced 48,782 kWh from December 1, 1982, through December 31, 1983. Oak Creek waived $ 467.44 of the first payment on the Carter note, for the approximately four-month period ending March 31, 1983, while distributing $ 12.22 to Mr. Tanner at a time when production would have otherwise been insufficient to cover 100 percent of the expenses attributable to petitioner's turbine. Thereafter, the accountants applied $ 934.63 (not the $ 934.75 set forth in the note), as the combined principal and interest payments on the Carter note, each quarter against gross production proceeds. Oak Creek remitted net proceeds after expenses to Mr. Tanner and the Ivanhoes, and carried negative balances forward to be applied against future production. The accrual of unpaid interest and principal due on Mr. Tanner's Carter note can be summarized as follows: Date
Negative
Balances
March 1983
---  June 1983
---  September 1983
273.24
December 1983
775.50
March 1984
638.36
June 1984
196.49
September 1984
537.24
December 1984
808.17
March 1985
1,005.30
June 1985
1,302.43
September 1985
1,599.56
December 1985
1,599.69
March 1986
2,796.82
June 1986
1,533.95
September 1986
2,700.61
December 1986
3,858.76
March 1987
3,953.24
June 1987
3,903.48
September 1987
3,355.31 December 1987
3,477.81
*270 Mr. Tanner's Carter wind turbine was also inoperable during portions of 1984 while parts from the manufacturer were on order. Oak Creek did not charge Mr. Tanner for maintenance and certain expenses while the wind turbine was not working. Oak Creek credited Mr. Tanner's account with actual kWh production, as well as the average production amount of other wind turbines for the periods during which his wind turbine was inoperable. The total amount produced and credited during 1984 was 53,776 kWh. The intensity of wind turbulence on the farm was not anticipated. Mr. Tanner's Carter wind turbine continued to have problems, and it did not actually produce any power in 1985 or the first six months of 1986. In the last six months of 1986, it produced 2,849 kWhs. In the first six months of 1987, it produced 10,508 kWhs. No power was produced in the last six months of 1987. As before, Oak Creek credited production allotments against the wind turbine's expenses. The parties presented no evidence as to production after 1987. In addition to the amounts credited to the account during periods of operation and nonoperation, $ 2,460 of the sales tax originally paid on the wind turbine *271 was credited against its expenses in 1986 after the State of California changed the method of taxing the wind turbines at Oak Creek. All the credits to the account did not consistently exceed expenses of the wind turbine. Neither Mr. Tanner nor the Ivanhoes made payments to eliminate the deficits for the Carter wind turbine. Mr. Tanner claims he was owed an amount equal to, or in excess of, any liability to Oak Creek because of a purported insurance settlement payment which was received and retained by Oak Creek when it went bankrupt. He had no documentary evidence of any such claims being made against Oak Creek. Mr. Tanner's Vestas wind turbine was placed in service before the end of 1982. In the beginning of 1983, due to "factory start-up and adjustments", the wind turbine's output was low. The four 1983 quarterly statements show that the Vestas wind turbine produced 126,756 kWh. The four 1984 quarterly statements show that production was 160,249 kWh. Oak Creek applied $ 1,815.41, the combined principal and interest payments on the Vestas note, against earnings each month. Oak Creek remitted net proceeds after expenses to Mr. Tanner and his coinvestors and applied negative *272 balances for the wind turbine against future production. In addition to the amounts credited to the account for the Vestas wind turbine from operation, $ 3,000 of the sales tax originally paid on the wind turbine was credited against its expenses in 1986 after the State of California changed the method of taxing the wind turbines at Oak Creek. The credits to the account did not consistently exceed expenses of the wind turbine so that the account fluctuated between positive and negative balances. The positive balances were eliminated by payment to Tanner and his coinvestors. Neither Mr. Tanner nor his coinvestors made payments to eliminate any deficits for the Vestas wind turbine. The accrual of unpaid interest and principal due on Mr. Tanner's Vestas note can be summarized as follows: Date
Negative Balances
March 1983
$ 831.89
June 1983
464.33
September 1983
533.97
December 1983
580.63
March 1984
547.46 June 1984
---  September 1984
326.05
December 1984
117.60
March 1985
500.57
June 1985
---  September 1985
---  December 1985
255.86
March 1986
1,706.86
June 1986
---  September 1986
970.46
December 1986
2,833.69
March 1987
2,682.50
June 1987
1,470.81
September 1987
1,198.05
*273 Furthermore, the initial negative balance on the Vestas note of $ 831.89 would have been approximately $ 450 higher had Oak Creek not waived the contract charges applicable to the first quarter ending March 31, 1983. Based on the fact that he had purchased a new wind turbine, Mr. Hodges was credited with the production of his Carter wind turbine from the initial date of operation even though it was in operation 2 months before he purchased it. The wind turbine produced 22,853 kWh during the part of 1982 that it was in operation. Oak Creek subtracted $ 934.63, as the combined principal and interest payments on the Carter note, each quarter from earnings. Oak Creek applied negative balances for the wind turbine against future production. Mr. Hodges' wind turbine was inoperable during the part of 1983 after the wind turbine and tower fell, and the wind turbine was destroyed. The wind turbine was replaced in 1983. Oak Creek credited the account for Mr. Hodges' wind turbine with actual kWh production before the accident, as well as the average production amount of other wind turbines for the periods during which the wind turbine was inoperable in 1983 and 1984. The total amount *274 of kilowatts produced and credited during 1983 and 1984 was 53,102 kWh and 64,850 kWh, respectively. Mr. Hodges' Carter wind turbine account was also credited 55,020 kWh for periods of operation and nonoperation in 1985. Mr. Hodges' wind turbine did not produce any power after 1985. In addition to the amounts credited to the account during periods of operation and nonoperation, $ 2,460 of the sales tax originally paid on Mr. Hodges' wind turbine was credited against its expenses in 1986 after the State of California changed the method of taxing the wind turbines at Oak Creek. The credits to the account did not consistently exceed expenses of Mr. Hodges' wind turbine so that the account fluctuated between positive and negative balances. After 1985, a deficit balance grew. Mr. Hodges made a $ 1,428.65 payment in December 1986 to eliminate the deficit at that time. Oak Creek had pledged Mr. Hodges' Carter note to the United Bank of Arizona on June 18, 1984. The record is not clear when, but the note was transferred to H. Arthur Nottingham, Curtis J. Henderson, and John A. Ditz, a group of investors (Nottingham Group). The Nottingham Group notified Mr. Hodges in 1987 that he *275 was in default on the payments due under the nonrecourse note owed to Oak Creek, and that if such payments were not made, foreclosure proceedings would commence. On May 26, 1988, Mr. Hodges executed a deed in lieu of foreclosure for his Carter wind turbine and transferred the wind turbine to the Nottingham Group in full satisfaction of all obligations with respect to the Hodges' Carter note. Deficiency Notices[6]
On their 1982 return, petitioners Tanner claimed and used an investment credit of $ 8,028, attributable in part to their wind turbine investments. Petitioners Tanner also claimed a business energy credit of $ 9,381 attributable to their wind turbine investment and used $ 2,165 of it for that year. On a Schedule C of their 1982 return, they reported no income from their wind turbine investments and claimed $ 9,381 *276 of depreciation and $ 215 of interest expense for a net loss of $ 9,596. They filed a Form 1045 Application for Tentative Refund for 1980 on October 19, 1983. They carried back $ 2,589 of the energy credit and carried over the balance. On their 1986 return, petitioners Tanner reported $ 3,626 of income from their wind turbine investments and claimed $ 13,133 of depreciation, $ 2,591 of interest, as well as other miscellaneous expenses, for total deductions of $ 16,994, resulting in a net loss of $ 13,368. They also claimed a general business credit carryover of $ 1,331 on their 1986 return. In a notice of deficiency to petitioners Tanner, respondent disallowed $ 9,596 of depreciation and interest expenses taken for 1982, $ 8,476 of the $ 10,193 in investment tax credits used for 1982, and the $ 2,589 credit carryback for 1980. In a separate notice of deficiency to petitioners Tanner, respondent disallowed $ 13,368 of the $ 16,994 in depreciation and other expenses (to the extent these expenses exceeded income) taken for 1986, and the $ 1,331 energy credit carryover used for 1986 with respect to their wind turbine investments. On their 1982 return, petitioners Hodges claimed *277 $ 11,727 of the tentative investment credit for 1982, attributable in part to their wind turbine investment. They claimed $ 12,720 as a business energy credit from their wind turbines but used none of it for 1982. On their 1982 return, they reported $ 1,323 of income from their wind turbine and deducted $ 12,720 in depreciation, $ 2,577 in interest, as well as other miscellaneous expenses, totalling $ 15,961, for a net loss of $ 14,638. An application for refund for petitioners Hodges' 1979 tax year is not in the record. The record is not clear as to the amount of carrybacks to petitioners Hodges' 1979 tax year. In a notice of deficiency to petitioners Hodges, respondent disallowed $ 14,638 of the $ 15,961 expenses (to the extent these expenses exceeded income) taken for 1982 attributable to their wind turbine investment. Respondent disallowed $ 8,480 of the unused investment credit, attributable in part to the Hodges' wind turbine investment. Respondent also disallowed the $ 12,720 of unused business energy credit attributable to petitioners Hodges' wind turbine investment. Respondent determined a deficiency and additions to tax for 1979 as previously detailed. OPINION *278 Nonrecourse Notes
In the notices of deficiency, respondent disallowed petitioners' credits and deductions with respect to their investments in the wind turbines because the transactions did not have any economic substance or were not entered into for profit. Respondent has admitted that petitioners' investments qualify for investment and energy credits. The recourse indebtedness of petitioners with respect to their wind turbine loans is not at issue because respondent has conceded that petitioners had a profit objective, that the investments had economic substance, and that petitioners properly took deductions and credits except as noted below. Respondent disputes the deductions and credits attributable to Mr. Tanner's Carter note and Vestas Note, and Mr. Hodges' Carter note, claiming these notes have no economic substance and are not bona fide debt. Respondent claims these notes comprise the portion of the purchase price that exceeds the value of their respective wind turbines due to "peculiar circumstances", and therefore, should not be includable in basis for purposes of claiming depreciation and/or interest expense deductions. Before we can decide whether or not the *279 debt is bona fide, we must first determine: (1) Whether "peculiar circumstances" existed to cause petitioners to overpay for their wind turbine investments; (2) whether the purchase prices paid for the wind turbines were in excess of their respective fair market values; and (3) whether the payments on the nonrecourse notes were so contingent that the debt should not be given economic effect. Peculiar Circumstances
As a general rule, the basis of property for tax purposes is its cost. Sec. 1012. This rule, however, does not apply where "peculiar circumstances" surround the transaction which influence the purchaser to agree to a price in excess of the property's fair market value. Bixby v. Commissioner, 58 T.C. 757, 776 (1972). In such cases, the basis of property for tax purposes may be limited to its fair market value at the time of purchase. Lemmen v. Commissioner, 77 T.C. 1326, 1348 (1981). In general, business transactions are given effect consistent with the substance and form of the transactions. When examining a transaction, the reality that the tax laws affect the shape of most business transactions cannot be ignored. *280 Frank Lyon Co. v. United States, 435 U.S. 561, 576-580 (1978). The existence of tax benefits accruing to an investor does not deprive a transaction of economic substance if the transaction has substance and business purpose apart from the tax benefits. Frank Lyon Co. v. United States, supra at 583-584; Knetsch v. United States, 364 U.S. 361, 365-370 (1960); Estate of Thomas v. Commissioner, 84 T.C. 412, 432 (1985). Taxpayers have the legal right to decrease taxes, or avoid them altogether, by means which the law permits. Maxwell v. Commissioner, 95 T.C. 107, 123 (1990). These principles are particularly relevant where very significant tax benefits are made available by the Federal and State governments for the specific purpose of promoting and stimulating the precise type of investments at issue. In previous cases, we have recognized transactions which are likely to be motivated by tax reasons, but are nevertheless sanctioned under the tax laws. Examples of such transactions are the purchase of tax-exempt securities; the purchase of property motivated by the availability of *281 accelerated depreciation, the investment credit, and the deductibility of interest; safe-harbor leasing; renovation of historic structures; location of subsidiaries in Puerto Rico because of tax credits; acquiring interests in low-income housing partnerships; and many others. Levy v. Commissioner, 91 T.C. 838, 871-872 (1988); Friendship Dairies, Inc., v. Commissioner, 90 T.C. 1054, 1064 (1988); Fox v. Commissioner, 82 T.C. 1001, 1021 (1984). During the 1982 year in issue, the relevant Federal tax credits consisted of a 10-percent regular investment credit and a 15-percent energy investment credit. Sec. 46(a). The energy investment credit was enacted as part of the Energy Tax Act of 1978, and was originally equal to 10 percent of the qualified investment. Pub. L. 95-618, sec. 301(a)(1), 92 Stat. 3174, 3194-3195. At the time of enactment of that act, Congress was concerned about the United States' dependence upon imported oil. The energy investment credit was enacted to stimulate investment into alternative energy resources, which included wind energy equipment. See H. Rept. 95-496 (Part III), 1978-3 C.B. (Vol. 2) 71, 81-85, 94; *282 S. Rept. 95-529, 1978-3 C.B. (Vol. 2) 199, 205-211, 262-264. Congress subsequently increased the energy investment credit to 15 percent of the qualified investment. Crude Oil Windfall Profit Tax Act of 1980, Pub. L. 96-223, sec. 221(a), 94 Stat. 229, 260. By enacting the energy investment credit, it is clear that Congress was inducing investment into alternative energy resources by effectively lowering the cost of alternate energy investments in order to curtail the United States' dependence upon imported oil. Thus, the favorable tax incentives petitioners expected to receive from their wind turbine investments should not be considered "peculiar circumstances" so as to reduce petitioners' bases, provided that these tax incentives did not cause petitioners to pay inflated purchase prices. See Bryant v. Commissioner, 790 F.2d 1463, 1466 (9th Cir. 1986), affg. T.C. Memo. 1983-633; Lemmen v. Commissioner, 77 T.C. at 1349. Valuation
Fair market value has been defined as the price at which a willing buyer will purchase property from a willing seller, when neither party is acting under compulsion and both *283 parties are fully informed of all relevant facts and circumstances. United States v. Cartwright, 411 U.S. 546, 551 (1973). This definition assumes that the buyer and seller have adverse economic interests. Marine v. Commissioner, 92 T.C. 958, 982 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991). Petitioners and respondent presented expert testimony with respect to what the fair market value of the wind turbines was in 1982. We are not bound by the opinions of expert witnesses when those opinions are contrary to our own judgment. Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990). We may accept or reject expert testimony as we find appropriate in our best judgment. Helvering v. National Grocery Co., 304 U.S. 282, 295 (1938). We found neither petitioners' nor respondent's expert witnesses to be credible. As previously stated, fair market value is the price at which a willing buyer and willing seller will purchase and/or sell property, when neither party is acting under compulsion. Some Oak Creek investors paid for their turbines without the use of nonrecourse *284 financing. In addition, the sum of Oak Creek's direct and indirect costs, including a reasonable profit, approximated the turbines' fair market value as well as the purchase price paid by petitioners. Accordingly, on this record, we conclude that petitioners did not pay in excess of fair market value for their wind turbines. Therefore, petitioners are entitled to the depreciation and interest expense deductions attributable to such nonrecourse debt, but subject to the limitations set forth below. At Risk Limitations
Section 465(a) provides that in the case of an individual "engaged in an activity to which this section applies, any loss from such activity for the taxable year shall be allowed only to the extent of the aggregate amount with respect to which the taxpayer is at risk * * * at the close of the taxable year". Section 465(c)(3) further provides that section 465(a) applies for tax years beginning after December 31, 1978, to any activity "engaged in by the taxpayer in carrying on a trade or business or for the production of income". Petitioners invested in their respective wind turbines after December 31, 1978. Respondent has conceded that petitioners' wind turbine *285 investments constitute an active trade or business and were held for the production of income. Accordingly, losses from such activity shall be allowed to the extent petitioners are at risk. Section 465(b)(1) provides that a taxpayer shall be considered at risk to the extent of the amount of money and the adjusted basis of other property contributed by the taxpayer to the activity. Section 465(b)(2) and (3) further provides that a taxpayer's at risk amount will also include borrowed amounts to the extent the taxpayer is personally liable for repayment, but not with respect to amounts protected against loss through nonrecourse financing. Levy v. Commissioner, 91 T.C. 838, 863 (1988); Abramson v. Commissioner, 86 T.C. 360, 375 (1986). Therefore, to the extent petitioners contributed cash or incurred recourse indebtedness to acquire their wind turbines, such amounts will be considered at risk for purposes of claiming losses arising from their investment. However, to the extent petitioners financed the purchase of their wind turbines through the use of nonrecourse indebtedness, such amounts will not increase petitioners' at risk basis for purposes *286 of claiming losses. Sec. 465(b)(4). Mr. Tanner asserts that to the extent he held claims against the manufacturer of the wind turbines, the insurer of the wind turbines, and Oak Creek in bankruptcy, such claims should be considered "other property" for purposes of increasing his amount at risk under section 465(b)(1). Mr. Tanner cites no authority for this proposition, and we find it to be without merit. Investment Tax Credit
Because petitioners are subject to the loss limitations of section 465, the general rule is that basis for investment credit purposes cannot exceed the amount they are at risk with respect to such property at the close of the taxable year in which the property is placed in service. Sec. 46(c)(8)(A). Section 46(c)(8)(F)(ii) provides in relevant part that, with respect to "qualified energy property", nonrecourse financing may be included in basis for purposes of computing the investment credit if: (1) The taxpayers' at risk basis, within the meaning of section 465(b), is equal to at least 25 percent of their total basis in the property; and (2) the nonrecourse financing with respect to such property consists of a level payment loan. A level payment *287 loan is defined in section 46(c)(8)(F)(iv) as "a loan in which each installment is substantially equal" and "a portion of each installment is attributable to the repayment of principal, and that portion is increased commensurate with decreases in the portion of the payment attributable to interest". Payments on the nonrecourse notes at issue were made from the net income produced from the sale of electricity. Negative balances were shown on the quarterly account statements and carried forward and offset against future production. Petitioners were neither required to nor did they make direct quarterly payments in satisfaction of the notes. Although the parties may have structured the nonrecourse notes in the form of level payment loans, they intended that the repayments were to be made out of production. Our determination with respect to whether or not the nonrecourse debt in issue is a level payment loan must be founded on substance and not form. Gregory v. Helvering, 293 U.S. 465 (1935). Wind turbine production was consistently insufficient to pay the quarterly payments as they came due on Oak Creek's nonrecourse loans. In fact, the very first payment *288 due on both of Mr. Tanner's nonrecourse notes was subsidized by Oak Creek through the use of debt payment waivers and contract charge abatements. By March 1987, Mr. Tanner's Carter note had actually accrued a negative balance of $ 3,953 which is more than the combined quarterly payments due on the note for an entire year. Likewise, production with respect to Mr. Tanner's Vestas turbine was erratic at best and often insufficient to pay the accrued interest and principal due on such note. Mr. Hodges, on the other hand, failed to submit sufficient documentation at trial, by quarter, regarding the accrual of unpaid interest and principal due on his Carter note. The rule is well established that the failure of a party to introduce evidence within his possession which, if true, would be favorable to him, gives rise to the presumption that if produced it would be unfavorable. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158 (1946), affd. 162 F.2d 513 (10th Cir. 1947). We therefore find that the negative balances which accrued on Mr. Hodges' Carter note were substantially similar to the negative balances which accrued on Mr. Tanner's Carter *289 note. In addition, we also recognize that Oak Creek waived 100 percent of the first quarterly payment due with respect to Mr. Hodges' Carter note on or before December 31, 1982, and 50 percent of the second quarterly payment due on or before March 31, 1983. Although Mr. Hodges testified that a deed in lieu of foreclosure was executed in May 1988 because he did not want his financial reputation or credit to be adversely affected, we found such testimony not to be credible. Rather, we conclude that Mr. Hodges executed the deed in lieu of foreclosure because he never had the intent to pay off his nonrecourse debt to Oak Creek with cash out of pocket. On this record, we conclude that Oak Creek's nonrecourse financing was inextricably tied to erratic production and therefore did not meet the level payment loan criteria mandated by section 46(c)(8)(F)(iv). Even if production had not been erratic, but rather was sufficient to cover the debt service on these nonrecourse notes, we further conclude that the initial debt payment waivers prevented these loans from ever meeting the level payment loan requirements of section 46(c)(8)(F)(iv). We, therefore, hold that such debt is not included *290 in petitioners' basis for investment credit purposes. Late Filing Addition
Section 6651(a)(1) provides for an addition to tax for failure to file a Federal income tax return by its due date, determined with regard to any extension of time for filing previously granted, unless such failure was due to reasonable cause and not willful neglect. Fischer v. Commissioner, 50 T.C. 164, 177 (1968). Petitioners Tanner filed their 1980 return on January 21, 1982. They claim that they acted with good cause and in good faith. Petitioners bear the burden of showing reasonable cause. Fischer v. Commissioner, supra. Petitioners Tanner have presented no evidence on this issue. Thus, respondent's determination on this issue is sustained. Rule 142(a). Negligence Additions
Respondent determined that petitioners were liable for additions to tax under section 6653(a) and asserted additions to tax under section 6653(a) in her amendment to answer. [7] For the respective year or years, section 6653(a), section 6653(a)(1), and section 6653(a)(1)(A) provide for an addition to tax in the amount of five percent of the underpayment of tax if any *291 part of the underpayment is due to negligence or intentional disregard of the rules and regulations. For the respective years, section 6653(a)(2) and section 6653(a)(1)(B) provide for a further addition to tax in the amount equal to 50 percent of the interest payable on the portion of the underpayment attributable to negligence or intentional disregard of rules and regulations. Petitioners have the burden of proof as to the additions determined by respondent, and respondent has the burden of proof as to the additions asserted in the amendment to answer. Rule 142(a); Achiro v. Commissioner, 77 T.C. 881, 889 (1981). Under section 6653(a), negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners have intentionally disregarded the at risk rules under sections 465(a) and 46(c)(8)(F). We have considered each of petitioners' arguments and find them to be without merit. Petitioners have failed to carry their burden of proof as to the additions determined by respondent. Because respondent has shown that petitioners *292 have intentionally disregarded the at risk rules, we also are satisfied that respondent has carried her burden of proof as to the additions raised in her amendment to answer. We therefore hold for respondent on this issue as applicable for the respective year or years under section 6653(a), section 6653(a)(1), and section 6653(a)(1)(A) if part of petitioners' underpayments are attributable to their disregard of the at risk rules under sections 465(a) and/or 46(c)(8)(F). To the extent petitioners' underpayments are attributable to their disregard of these at risk rules, we hold for respondent under section 6653(a)(2) and section 6653(a)(1)(B), as applicable for the respective year or years. *293 Substantial Understatement Addition
Section 6661 imposes an addition to tax in an amount equal to 25 percent of the amount of any underpayment attributable to a substantial understatement of income tax. Pallottini v. Commissioner, 90 T.C. 498 (1988). An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return for the taxable year of $ 5,000. Sec. 6661(b)(1)(A). The amount of the understatement is equal to the excess of the amount of tax required to be shown on the return for the taxable year less the amount of tax shown on the return. Sec. 6661(b)(2)(A); Woods v. Commissioner, 91 T.C. 88, 94 (1988). The amount of the understatement as determined under section 6661(b)(2)(A) may be reduced by that portion of the understatement which is attributable to an item for which there is substantial authority, or for which the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return. Sec. 6661(b)(2)(B). Petitioners had neither substantial authority nor adequate disclosure with respect to the limitations applicable *294 to the nonrecourse debt previously discussed above. We therefore conclude that the 25-percent addition to tax under section 6661 applies to petitioners for 1982 if the Rule 155 computation results in a substantial understatement of income tax within the meaning of section 6661(b)(1)(A). Increased Interest
The final issue for decision is whether petitioners are liable for the increased rate of interest under section 6621(c). Section 6621(c) (formerly section 6621(d)) provides that with respect to interest payable under section 6601, an increase in the rate of interest to 120 percent of the otherwise applicable rate is imposed when there is a "substantial underpayment" (an underpayment in excess of $ 1,000) attributable to tax motivated transactions. The increased rate of interest applies to interest accruing after December 31, 1984, even though, as here, the transactions were entered into prior to the date of enactment of section 6621(c). DeMartino v. Commissioner, 88 T.C. 583, 589 (1987), affd. 862 F.2d 400 (2d Cir. 1988). Section 6621(c)(3)(A)(ii) provides that "the term 'tax motivated transaction' means * * * any loss disallowed by *295 reason of section 465(a) and any credit disallowed under section 46(c)(8)". In light of our holdings with respect to those issues, petitioners will be liable for the increased rate of interest under section 6621(c) if their underpayments due to tax motivated transactions exceed $ 1,000. Orders will be issued restoring these cases to the general docket for disposition of remaining issues. Footnotes
1. The case of petitioners James B. Hodges and Dorothy B. Hodges, docket No. 22654-86 was consolidated with the cases of petitioners Gordon Tanner and Joan Tanner, docket Nos. 213-86 and 22228-89, for trial and opinion. These cases were consolidated solely for the purpose of deciding issues relating to petitioners' investments in turbines used to generate electricity from wind power. In each case, the notice of deficiency covered issues other than those to be decided here.↩
2. These cases are part of a large group of cases which involve issues relating to Oak Creek Energy Wind Turbines. The parties in a number of these cases have agreed to be bound by the outcome of those issues in Gordon Tanner and Joan Tanner, docket No. 213-86, or in that docket number and its related docket No. 22228-89.↩
1. 50 percent of the interest due on the underpayment attributable to negligence.↩
1. 50 percent of the interest due on the underpayment attributable to negligence.↩
3. Although the petition in Tanner v. Commissioner↩, docket No. 213-86 raised a statute of limitations issue for 1980, this issue was not argued at trial or on brief, and we deem it conceded.
4. See tit. 16 U.S.C. sec. 824a-3 (1988)↩.
*. Beginning in 1983↩
5. The record does not contain a Sales and Management Agreement between Mr. Hodges and Oak Creek. However, it was stipulated that the agreement was identical to the agreement used in all other Carter wind turbine purchases.↩
6. The deficiencies were based on many items. However, except as otherwise noted, we redetermine the deficiencies only to the extent related to petitioners' investments in wind turbines.↩
7. Respondent asserted the negligence additions in Tanner v. Commissioner, docket No. 213-86, under sec. 6653(a) for 1980 and under sec. 6653(a)(1) and (2) for 1982 in her amendment to answer. Respondent determined the negligence additions in Tanner v. Commissioner, docket No. 22228-89 for 1986 under sec. 6653(a)(1)(A) and (B). In Hodges v. Commissioner, docket No. 22654-86, respondent determined the negligence additions for 1979 under sec. 6653(a) and for 1982 under sec. 6653(a)(1) and (2)↩.